UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

ALLSTATE INSURANCE COMPANY;
ALLSTATE FIRE AND CASUALTY
INSURANCE COMPANY; and ALLSTATE
PROPERTY AND CASUALTY
INSURANCE COMPANY,

C.A. No. _____

             Plaintiffs,

v.

HEALING SERVICE PHYSICAL
THERAPY INC; HAPPY LIFE TWO
INC; NEW AGE PT REHAB INC;
FAITH PHYSICAL THERAPY LLC;
CORE PHYSICAL THERAPY CORP;
MIRNA PHYSICAL THERAPY LLC;
OLYMPIC PHYSICAL THERAPY
PLUS LLC; MIRNA KAKOS; THAER
KAKOS; LOUAY AL SOUDANI;
SALWA ELIA; LAMYA FAKHOURI;
NICK HEMANA; NICHOLAS SESI;
NATHAM KARRUMI, D.C.; and
NAVEED SIDDIQUE, M.D.,

**Demand for Jury Trial**

             Defendants.

## COMPLAINT

Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company (hereinafter collectively referred to as "Allstate" and/or "plaintiffs"), by their attorneys SMITH & BRINK, hereby allege as follows.

1

## I. <u>INTRODUCTION</u>

1.     This is a case about a network of physical therapy clinics and the owners, managers, agents, and representatives of the same who abused the medical benefits available under the Michigan No-Fault Act, Mich. Comp. Laws § 500.3101, *et seq*., by engaging in a scheme to defraud Allstate by submitting and causing to be submitted false and fraudulent medical records, bills, and invoices through interstate wires and the U.S. Mail seeking payment under the No-Fault Act for treatment and services that were not actually rendered, were medically unnecessary, were fraudulently billed, and were not lawfully rendered.

2.     Defendants Healing Service Physical Therapy Inc ("Healing Service PT"), Happy Life Two Inc ("Happy Life"), New Age PT Rehab Inc ("New Age PT"), Faith Physical Therapy LLC ("Faith PT"), Core Physical Therapy Corp ("Core PT"), Mirna Physical Therapy LLC ("Mirna PT"), Olympic Physical Therapy Plus LLC ("Olympic PT"), Mirna Kakos, Thaer Kakos, Louay Al Soudani ("Al Soudani"), Salwa Elia ("Elia"), Lamya Fakhouri ("Fakhouri"), Nick Hemana ("Hemana"), Nicholas Sesi ("Sesi"), Natham Karrumi, D.C. ("Karrumi"), and Naveed Siddique, M.D. ("Siddique") (collectively, the "defendants") each conspired to, and did in fact, defraud Allstate by perpetuating an insurance billing fraud scheme in violation of state and federal law.

3.      The insurance fraud scheme perpetrated by the defendants was designed to, and did in fact, result in payments from Allstate to and on behalf of the defendants.

4.      All of the acts and omissions of the defendants, described throughout this Complaint, were undertaken intentionally.

5.      By this Complaint, and as detailed in each count set out below, Allstate brings this action for: (1) violations of the federal Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. § 1962(c) and (d); (2) common law fraud; (3) civil conspiracy; (4) payment under mistake of fact; and (5) unjust enrichment. Allstate also seeks declaratory relief that no previously-denied and pending claims submitted to it by the defendants are compensable.

6.      As a result of the defendants' fraudulent acts, Allstate has paid in excess of $2,775,094 to them related to the patients at issue in this Complaint.

## II.   **THE PARTIES**

### A.   **PLAINTIFFS**

7.      Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company are each companies duly organized and existing under the laws of the State of Illinois.

8.     Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company have their respective principal places of business in Northbrook, Illinois.

9.     At all times relevant to the allegations contained in this Complaint, the plaintiffs were authorized to conduct business in the State of Michigan.

### B.     DEFENDANTS

#### 1.     Healing Service Physical Therapy Inc

10.     Defendant Healing Service Physical Therapy Inc is incorporated under the laws of the State of Michigan.

11.     At all relevant times, Healing Service PT was operated and controlled by defendants Hemana and Siddique.

12.     Healing Service PT's principal place of business is located in Sterling Heights, Michigan.

13.     Healing Service PT billed Allstate for services that were not actually rendered, were medically unnecessary (to the extent services were rendered at all), and were unlawful in relation to several Allstate insureds, including the patients set out in Exhibit 1.

#### 2.     Happy Life Two Inc

14.     Defendant Happy Life Two Inc is incorporated under the laws of the State of Michigan.

15.     Happy Life also does business using the registered fictitious name Happy Life Physical Therapy.

16.     At all relevant times, Happy Life was operated and controlled by defendants Sesi and Karrumi.

17.     Happy Life's principal place of business is located in Sterling Heights, Michigan.

18.     Happy Life billed Allstate for services that were not actually rendered, were medically unnecessary (to the extent services were rendered at all), and were unlawful in relation to several Allstate insureds, including the patients set out in Exhibit 2.

### 3.     New Age PT Rehab Inc

19.     Defendant New Age PT Rehab Inc is incorporated under the laws of the State of Michigan.

20.     At all relevant times, New Age PT was operated and controlled by defendants Fakhouri and Siddique.

21.     New Age PT's principal place of business is located in Shelby Township, Michigan.

22.     New Age PT billed Allstate for services that were not actually rendered, were medically unnecessary (to the extent services were rendered at all), and were

unlawful in relation to several Allstate insureds, including the patients set out in Exhibit 3.

### 4.    Faith Physical Therapy LLC

23.    Defendant Faith Physical Therapy LLC is organized under the laws of the State of Michigan.

24.    Faith PT's sole member is defendant Al Soudani, who is a citizen of the State of Michigan.

25.    At all relevant times, Faith PT was operated and controlled by defendants Al Soudani and Mirna Kakos.

26.    Faith PT's principal place of business is located in Warren, Michigan.

27.    Faith PT billed Allstate for services that were not actually rendered, were medically unnecessary (to the extent services were rendered at all), and were unlawful in relation to several Allstate insureds, including the patients set out in Exhibit 4.

### 5.    Core Physical Therapy Corp

28.    Defendant Core Physical Therapy Corp is incorporated under the laws of the State of Michigan.

29.    At all relevant times, Core PT was operated and controlled by defendants Elia and Siddique.

30.    Core PT's principal place of business is located in Sterling Heights, Michigan.

31.    Core PT billed Allstate for services that were not actually rendered, were medically unnecessary (to the extent services were rendered at all), and were unlawful in relation to several Allstate insureds, including the patients set out in Exhibit 5.

### 6.    Mirna Physical Therapy LLC

32.    Defendant Mirna Physical Therapy LLC is organized under the laws of the State of Michigan.

33.    Mirna PT's sole member is Mirna Kakos, who is a citizen of the State of Michigan.

34.    At all relevant times, Mirna PT was operated and controlled by defendants Mirna Kakos and Thaer Kakos.

35.    Mirna PT's principal place of business is located in Sterling Heights, Michigan.

36.    Mirna PT billed Allstate for services that were not actually rendered, were medically unnecessary (to the extent services were rendered at all), and were unlawful in relation to several Allstate insureds, including the patients set out in Exhibit 6.

### 7.    <u>Olympic Physical Therapy Plus LLC</u>

37.    Defendant Olympic Physical Therapy Plus LLC is organized under the laws of the State of Michigan.

38.    Olympic PT's sole member is Mirna Kakos, who is a citizen of the State of Michigan.

39.    At all relevant times, Olympic PT was operated and controlled by defendants Mirna Kakos, Thaer Kakos, and Siddique.

40.    Olympic PT's principal place of business is located in Sterling Heights, Michigan.

41.    Olympic PT billed Allstate for services that were not actually rendered, were medically unnecessary (to the extent services were rendered at all), and were unlawful in relation to several Allstate insureds, including the patients set out in Exhibit 7.

### 8.    <u>Mirna Kakos</u>

42.    Defendant Mirna Kakos is a resident and citizen of the State of Michigan.

43.    At all relevant times, Mirna Kakos operated and conducted defendants Faith PT, Mirna PT, and Olympic PT.

### 9.    **Thaer Kakos**

44.    Defendant Thaer Kakos is a resident and citizen of the State of Michigan.

45.    At all relevant times, Thaer Kakos operated and conducted defendants Mirna PT and Olympic PT.

### 10.    **Louay Al Soudani**

46.    Defendant Louay Al Soudani is a resident and citizen of the State of Michigan.

47.    At all relevant times, Al Soudani operated and conducted defendant Faith PT.

### 11.    **Salwa Elia**

48.    Defendant Salwa Elia is a resident and citizen of the State of Michigan.

49.    At all relevant times, Elia operated and conducted defendant Core PT.

### 12.    **Lamya Fakhouri**

50.    Defendant Lamya Fakhouri is a resident and citizen of the State of Michigan.

51.    At all relevant times, Fakhouri operated and conducted defendant New Age PT.

### 13. <u>Nick Hemana</u>

52.    Defendant Nick Hemana is a resident and citizen of the State of Michigan.

53.    At all relevant times, Hemana operated and conducted defendant Healing Service PT.

### 14. <u>Nicholas Sesi</u>

54.    Defendant Nicholas Sesi is a resident and citizen of the State of Michigan.

55.    At all relevant times, Sesi operated and conducted defendant Happy Life.

### 15. <u>Natham Karrumi, D.C.</u>

56.    Defendant Natham Karrumi, D.C. is a resident and citizen of the State of Michigan.

57.    At all relevant times, Karrumi operated and conducted defendant Happy Life.

### 16. <u>Naveed Siddique, M.D.</u>

58.    Defendant Naveed Siddique, M.D. is a resident and citizen of the State of Michigan.

59.    At all relevant times, Siddique operated and conducted defendants Healing Service PT, New Age PT, Core PT, and Olympic PT.

## III.   JURISDICTION AND VENUE

60.     Pursuant to 28 U.S.C. § 1331, this Court has jurisdiction over this action relating to the claims brought by the plaintiffs under 18 U.S.C. § 1961, *et seq.* because they arise under the laws of the United States.

61.     Pursuant to 28 U.S.C. § 1332, this Court has jurisdiction over this action because the amount in controversy, exclusive of interest and costs, exceeds $75,000 against each defendant and because it is between citizens of different states (as detailed in the foregoing section).

62.     Supplemental jurisdiction over the plaintiffs' state law claims is proper pursuant to 28 U.S.C. § 1367.

63.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) whereas the vast majority of the acts at issue in this Complaint were carried out within the Eastern District of Michigan.

## IV.   BACKGROUND ON THE DEFENDANTS AND THEIR SCHEME

64.     The defendants utilized kickback payments, illegal solicitation, staged accidents, and other unlawful methods to induce individuals who claimed to have been involved in motor vehicle accidents to appear for medically unnecessary physical therapy that was not actually provided, was unlawful, and was fraudulently billed.

11

65.    Once patients were unlawfully and improperly solicited to the defendants for treatment that they did not actually need, the defendants maintained them within their network of physical therapy clinics irrespective of medical necessity.

66.    The individual defendants who organized and controlled the defendant clinics worked collectively to accomplish the fraudulent scheme described herein and directed all aspects of the clinics' patient acquisition, treatment, and referrals.

67.    Once patients were acquired by a defendant clinic, they were transferred between clinics pursuant to *quid pro quo* arrangements designed to maximize the total amount charged by all defendant clinics to Allstate.

68.    The defendants shared common connections and relationships that incentivized them to operate as a singular fraudulent scheme that was designed to unlawfully obtain and maintain the maximum number of physical therapy patients and visits to generate as many bills to Allstate as possible for the benefit of the group as a whole.

### A.    THE DEFENDANTS OBTAINED PRESCRIPTIONS FROM THE SAME PHYSICIANS

69.    The defendant clinics maintained the same rosters of unscrupulous physicians from whom they obtained the prescriptions for physical therapy they needed in order to bill Allstate.

70.     Michigan law requires that physical therapy exceeding twenty-one (21) days or ten (10) visits must be prescribed by a licensed medical or osteopathic doctor pursuant to Mich. Comp. Laws § 333.17820(1), which required the defendants to work in conjunction with physicians in order to bill Allstate.

71.     In many cases, patients who were solicited or otherwise illegally induced to the defendants were merely sent to a physician to obtain a prescription in a *pro forma* exercise that did not involve any actual medical decision making.

72.     One physician who wrote prescriptions to allow the defendant clinics to bill was defendant Siddique, who wrote physical therapy prescriptions relative to at least twenty-four (24) patients at issue herein, which were used by defendants Core PT, New Age PT, Healing Service PT, and Olympic PT to bill Allstate.

73.     Siddique has a disciplinary history that illustrates his disregard for proper patient evaluation and care.

74.     On March 15, 2017, the Disciplinary Subcommittee of the Michigan Board of Medicine entered into a Consent Order and Stipulation with Siddique related to his negligence and incompetence in violation of the Public Health Code, Mich. Comp. Laws § 333.1101, *et seq.* that resulted in the death of a patient.

75.     An expert review of Siddique's purported patient examinations at issue determined Siddique's evaluation and conduct was "a violation of general duty and

a departure from minimal standards of acceptable and prevailing practice for the profession."

76.     Siddique was required to pay a fine, had his medical license placed on probation for two (2) years, and was required to enter into an independent monitoring agreement for quarterly reviews of his medical records.

77.     The independent quarterly review of Siddique confirmed he failed to properly maintain patient records and exhibited numerous inadequacies in his monitoring.

78.     On December 4, 2020, Siddique entered into a second Consent Order admitting he again violated the Public Health Code, Mich. Comp. Laws § 333.1101, *et seq.* by failing to properly submit the independent monitoring quarterly review mandated by the original Consent Order.

79.     Consistent with these prior disciplinary violations, Siddique's alleged "examinations" of the patients at issue herein that resulted in referrals for physical therapy to the defendants did not approach applicable standards of care.

80.     Indeed, it is unclear whether any examinations were actually performed at all, as Siddique has never billed Allstate for such purported examinations or submitted any records of patient evaluations.

81.     Instead of performing the tests and physical assessments required before physical therapy can be deemed medically necessary, Siddique simply wrote

all patients general physical therapy prescriptions that directed the defendants to "evaluate and treat" the referred patient.

82.     Another pain management clinic used by the defendants was called Star Pain Management & Rehab LLC ("Star Pain"), and it wrote prescriptions for physical therapy that were used by defendants Core PT, Faith PT, New Age PT, Healing Service, and Happy Life to bill Allstate relative to at least forty-two (42) of the patients at issue herein.

83.     Half of the referrals made by Star Pain (twenty-one (21)) patients were to defendant Core PT.

84.     A former employee of defendant Faith PT testified that 30% of Faith PT's referrals came from Star Pain.

85.     Star Pain is owned by Nabil Beydoun, Fouad Baydoun, and Muna Afan ("Afan"), and prescriptions for physical therapy at issue in this litigation were primarily written by a physician named Riad Khoury, M.D. ("Khoury").

86.     Khoury has testified that Star Pain targeted individuals who claimed to have been involved in automobile accidents because it viewed the No-Fault Act as "a golden goose" because entities such as Star Pain "get more [payment]" billing auto insurers like Allstate than billing private insurers.

87.     Khoury also testified that he and Star Pain applied different treatment for No-Fault patients, including prescriptions for physical therapy, which went on

for years with auto insurance coverage but would be cut off by other insurers after three (3) months.

88.    Afan was responsible for soliciting patients for Star Pain, and used unlawful methods including payment of cash kickbacks to patients to induce them to seek treatment they did not actually require.

89.    Several of the defendants at issue herein had relationships with Afan, including Core PT, where Afan was formerly employed.

90.    Another pain management clinic used by the defendants was called Greenfield and 9 Mile Medical Center PLLC d/b/a American Medical Center ("AMC"), which wrote prescriptions for physical therapy that were used by defendants Core PT, Faith PT, New Age PT, Healing Service, Happy Life, and Mirna PT to bill relative to at least thirty-two (32) of the patients at issue herein.

91.    One patient of AMC described the clinic as follows: "[AMC] seems like a sort of scam place because [the patients were] mostly younger folks…it seemed like there wasn't nothing wrong with them…it seem[ed] like they were doing scams for the insurance."

92.    AMC is controlled by a layperson named Norman Dehko, who has admitted in sworn testimony that physical therapy providers have paid him for patient referrals.

93.     Norman Dehko also controls an auto collision business called Somerset Auto Body of MI, Inc. ("Somerset Auto"), and uses that business to illegally solicit patients and direct their treatment.

94.     Several of the patients at issue herein had work done on their vehicles at Somerset Auto following alleged accidents.

95.     One tow truck driver who received numerous payments from Somerset Auto confirmed to Allstate that he (a layperson) talked about going to physical therapy with people he picked up at accident scenes.

96.     This tow truck driver reported that he only referred these individuals to auto body shops instead of directly to providers because the auto body shops like Somerset Auto have physical therapy referrals "on lock."

97.     Norman Dehko has a long history of insurance fraud and unlawful solicitation of motor vehicle accident victims.

98.     In 2007, Norman Dehko, along with his mother, Latifa Dehko, and his brother, Dickow Dehko, were arrested and charged with insurance fraud in connection with a scheme that involved falsification of reports and enhancing collision damage.

99.     Norman Dehko, who was described as the ringleader of the scheme, was charged with forty (40) felonies, and was alleged to have used as many as twelve (12) separate auto body shops to perpetrate the fraud.

17

100.   In 2012, Norman Dehko pleaded guilty to insurance fraud conspiracy.

101.   Norman Dehko has also been implicated in a scheme in which a former Detroit police officer was convicted of misconduct in office for, *inter alia*, creating falsified police reports for Dehko and others.  *See* State of Michigan v. Schuh, No. 08-013141-FH, Wayne Circuit Court.

102.   The convicted officer admitted that he had received between five and seven thousand dollars in "loans" from collision shop owners that had no payback arrangement, and that were not in fact paid back.

103.   Norman Dehko's illegal solicitation and physical therapy scheme was recently detailed in a Detroit Free Press article, which identified specific victims of the                  solicitation                  scheme.                  *See* https://www.freep.com/story/money/business/2021/04/09/ambulance-chasers-soliciting-michigan-victims/7125121002/.

104.   The physicians at AMC who wrote the prescriptions that allowed the defendants to bill also have an astounding history of fraud and illegal conduct.

105.   One of AMC's physicians was David Jankowski, D.O. ("Jankowski"), who has been under indictment since June 7, 2017 (the entire time he worked at AMC) for conspiracy to commit healthcare fraud (18 U.S.C. § 1349).  United States v. Jankowski, 17-cr-20401-BAF-DRG (E.D. Mich.).   The State of Michigan suspended Jankowski's license for 3 years on April 11, 2019 and fined him $25,000.

106.   Following Jankowski's license suspension, he was replaced at AMC by Ganiu Edu, M.D. ("Edu"), who was indicted on December 4, 2018 on numerous charges including (1) conspiracy to commit healthcare fraud (18 U.S.C. § 1349), (2) aiding and abetting healthcare fraud (18 U.S.C. § 1347), and (3) conspiracy to distribute and possess with intent to distribute controlled substances (21 U.S.C. § 846, 21 U.S.C. § 841(a)(1)).  United States v. Rajendra Bothra, *et al.*, 2:18-cr-20800-SJM-APP (E.D. Mich.).  Edu was also under indictment the entire time he worked for AMC.

107.   Physical therapy prescriptions at issue herein were also written by AMC physician Surya Nallani, M.D. ("Nallani"), who entered into a plea agreement in January 2016 admitting to unlawfully billing Medicare.  United States v. Surya C. Nallani, M.D., 2:11-cr-20365-VAR-RSW (E.D. Mich.).

108.   The blanket, non-descript physical therapy prescriptions written by Star Pain, AMC, Siddique, and others allowed the defendants to prescribe all patients their standard, predetermined protocol of treatment regardless of whether it was actually medically appropriate.

109.   The defendants each obtained prescriptions from these same physicians as part of their singular scheme because they were aware that these physicians would not evaluate whether treatment was effective (or being performed at all) and would

continue to write prescriptions for therapy solely to generate bills to submit to Allstate, regardless of patients' medical conditions.

### B.   REFERRALS OF PATIENTS BETWEEN THE DEFENDANTS

110.   Once patients were acquired by the defendants and physical therapy prescriptions obtained from their common group of physicians, the defendants frequently rotated patients between themselves and billed for redundant treatment and services identical to those billed by other defendants.

111.   For example, Faith PT, Happy Life, and Healing Service PT all submitted bills for nearly identical physical therapy modalities for patient I.G. (Claim No. 0570491654)[1] over a more than fourteen (14) month period without providing any explanation as to why I.G. rotated between defendants or required the same treatment billed by three (3) separate physical therapy clinics.

112.   Similarly, Healing Service PT billed for purported treatment of patient A.N. (Claim No. 0500933429) from May 18, 2018 through October 8, 2018.

113.   Without any explanation for why A.N. switched facilities, Core PT then immediately started billing for highly similar treatment from October 10, 2018 through November 8, 2018.

---

[1] To protect the confidentiality of the patients at issue herein, Allstate refers to them by initials and Allstate claim number.

114.   Again without any reasoning provided, Healing Service PT then resumed billing for A.N. from November 21, 2018 through August 2, 2019.

115.   Neither facility's records discuss how the physical therapy billed at the other facility influenced A.N.'s condition, which confirms A.N. alternating between facilities was not medically motivated but was instead solely intended to generate bills for multiple defendants in the common scheme.

116.   At least five (5) patients for whom Faith PT billed for purported physical therapy also allegedly underwent nearly identical treatment with at least one other different defendant clinic, including Core PT, Mirna PT, Happy Life, New Age PT, and Healing Service.

117.   Patients for whom Core PT billed also purportedly underwent physical therapy treatment at defendants Faith PT, Olympic PT, and New Age PT.

118.   In some cases, the records purporting to record the services to the patients who switched between clinics were completely identical (including typographical errors, capitalizations, etc.) except for the letterhead thereon.

119.   For example, despite supposedly being a separate clinic, New Age PT's purported medical history relative to patient M.C. (Claim No. 0429088362) was copied verbatim (including the same inconsistent capitalizations) from Core PT's initial examination:

**New Age PT:**

CURRENT MEDICAL HISTORY

Patient was the driver of the car. While driving at the intersection of 22 mile road and ryan road, he blacked out for a few seconds and his car hit a semi-truck in front of him. 911 and EMS came and they had to cut his car and pull him out of it. Per patient report, he was unconscious and unresponsive and was given CPR. Pt then taken to Beaumont hospital, Troy and was admitted for 7 days. He was then discharged and had in-home physical therapy for 1 month. Pt then referred for physical therapy.

On examination, paraspinal lumbar

**Core PT:**

**History of Present Condition/Mechanism of Injury:** Patient was the driver of the car. While driving at the intersection of 22 mile road and ryan road, he blacked out for a few seconds and his car hit a semi-truck in front of him. 911 and EMS came and they had to cut his car and pull him out of it. Per patient report, he was unconscious and unresponsive and was given CPR. Pt then taken to Beaumont hospital, Troy and was admitted for 7 days. He was then discharged and had in-home physical therapy for 1 month. Pt then referred for physical therapy.

120.   These identical records confirm that New Age PT had access to Core PT's electronic version of M.C.'s medical record, which was clearly copied and pasted into New Age PT's own system.

121.   Patients were able to be shuffled between the defendant clinics because the defendant clinics utilized the same runners, solicitors, employees, and prescribing physicians, along with the same predetermined protocol of purported services, all of which are described in detail below.

C.   **THE DEFENDANTS' COMMON ASSOCIATES**

122.   Many solicitors, therapists, employees, and managers had associations with multiple defendants, further confirming that they operated as part of a singular scheme to defraud.

123.   For example, defendant Elia, who owns defendant Core PT with a physical therapist named Payal Bhagat, was previously associated with New Age PT organizers Khalid Gazguz and Hansee Sesi through their co-ownership and

management of a clinic called Sterling Physical Therapy Provider Corp ("Sterling PT"), which operated in the location that later became defendant Core PT.

124.   Elia and Hemana, the owner of Healing Service PT, also used common commercial locations for their businesses.

125.   Happy Life's organizer and co-owner, defendant Karrumi, has been observed at Healing Service PT entering and leaving the clinic despite not being a patient.

126.   New Age PT shared an address with a physician named Victor Al-Matchy, M.D., who referred patients at issue herein to the defendant clinics, including to Healing Service PT, Happy Life, Core PT, and Olympic PT.

127.   Faith PT has filed litigation in Michigan state court in conjunction with an MRI facility owned by Happy Life's co-owner, Karrumi, further evidencing Karrumi's relationship with that clinic that shared at least five (5) patients with Happy Life.

128.   A physical therapist named Salvi Ashish is the only physical therapist employed by Mirna PT, where he works three (3) days per week.  The other two (2) days per week, Salvi Ashish works at Faith PT.

129.   Mirna Kakos, the owner of defendants Mirna PT and Olympic PT, and a former employee of defendant Faith PT, along with her mother and father

(defendant Thaer Kakos), were alleged patients of defendant New Age PT following a purported motor vehicle accident.

130.   Around three (3) months into her Faith PT employment, the Kakos family claimed to be involved in second motor vehicle accident, which was clearly staged.

131.   Following this staged accident, Mirna Kakos claimed to seek treatment with her employer Faith PT, which continued until January 2019.

132.   Mirna Kakos and Thaer Kakos were referred to Faith PT (Mirna Kakos's employer) by Star Pain and Khoury.

133.   In February 2019, rather than return to her former employment at Faith PT, layperson Mirna Kakos organized her own clinic, Mirna PT, and later opened a second clinic, Olympic PT.

134.   Olympic PT was merely a continuation of a physical therapy clinic at the same location called Pure Land Physical Therapy, PLLC ("Pure Land"), which was owned by an individual named Mohammad Abraham ("Abraham").

135.   Abraham testified that he owned Pure Land with individuals named Frank Gorges and Basil Gorges, whom he brought on as co-owners because they had connections with attorneys to get "good patient[s]."

136. Abraham agreed to transfer all of the equipment owned by Pure Land to Mirna Kakos and Thaer Kakos in exchange for an entitlement to 15-25% of the net profit of Olympic PT.

137. Abraham also illegally owned and operated a pain management clinic called Mercyland Health Services, PLLC ("Mercyland") as a layperson.

138. Mercyland also obtained patients through illegal solicitation and kickbacks, and its bank records document thousands of dollars of payments to runners who have also been associated with the defendants.

139. One runner associated with Mercyland was named Abdulatif Yaldo ("Yaldo"), and was observed making regular stops at several law offices and medical clinics, including defendant Healing Service PT and defendant Siddique's business, Universal Urgent Care.

140. Yaldo has family members who operate several auto body shops called "Special Way," and at least two (2) patients of New Age PT at issue herein allegedly had work done on their vehicles at one of these shops following an alleged accident.

141. These extensive connections and associations between the defendants are not coincidental; the defendants intentionally operated as a singular scheme by which they each benefited by maintaining a network of solicitation, kickback payments, and predetermined treatment protocols to generate the highest possible amount of charges to Allstate.

25

142. As detailed below, the specific methods by which each defendant clinic and their owners defrauded Allstate were nearly identical.

## V. BILLING FOR SERVICES NOT RENDERED

143. The defendants regularly submitted bills to Allstate seeking payment for physical therapy treatment and services that were never rendered to patients at issue herein.

144. The defendants' pervasive pattern of faxing and mailing demands for payment for services that were not rendered is indicative of their goal to submit as many claims for payment as possible regardless of whether physical therapy was actually rendered and whether it was medically necessary (discussed in detail *infra*).

145. All of the claims submitted by the defendants to Allstate through interstate wires and the U.S. Mail seeking payment for treatment that never occurred are fraudulent.

146. Allstate is not required to pay the defendants for treatment that was never provided to patients at issue in this Complaint and is entitled to recover any payments tendered to the defendants in reliance on their fraudulent billing for treatment not rendered.

### A. BILLING FOR APPOINTMENTS AND EXERCISES NOT PERFORMED

147. The defendants billed for entire appointments that never occurred.

148.   Numerous patients were observed never entering the defendant clinics on dates that Allstate was billed for extensive treatment.

149.   For example, patient S.S. (Claim No. 0574746244) remained home on July 5, 2019 and did not depart his house for the entire day.

150.   Despite S.S. never leaving his home, Healing Service PT billed for alleged treatment and even submitted a patient sign in sheet "signed" by S.S. on July 5, 2019:



151.   On both October 7, 2019 and October 9, 2019, patient V.S. (Claim No. 0552540866) remained at her home throughout the entire day.  V.S. never entered Core PT's facility on either of these dates.

152.   Despite V.S. never presenting to the clinic, Core PT billed for extensive treatment for V.S. on both October 7, 2019 and October 9, 2019, including charging for purported application of hot/cold packs, electrical stimulation, ultrasound treatment, therapeutic exercises, manual therapy, and therapeutic activities.

153. Defendant Faith PT also submitted fabricated patient sign-in sheets to create the appearance that patients had actually presented to the clinic for treatment.

154. For example, Faith PT submitted two separate sign-in sheets that were "signed" by patient S.M. (Claim No. Z5228294) at two entirely different times for the same June 14, 2019 date of service:

| DATE | PATIENT SIGNATURE | TIME IN | TIME OUT |
|------|-------------------|---------|----------|
| ▮▮▮▮ | ▮▮▮▮▮▮▮▮▮▮▮▮ | ▮▮▮▮ | ▮▮▮▮ |
| 6-14-19 | | 10:10 | 11:20 |

| DATE | PATIENT SIGNATURE | TIME IN | TIME OUT |
|------|-------------------|---------|----------|
| ▮▮▮▮ | ▮▮▮▮▮▮▮▮▮▮▮▮ | ▮▮▮▮ | ▮▮▮▮ |
| 6-14-19 | | 4:31 | 5:41 |

155. The defendants also routinely submitted bills for specific physical therapy modalities that patients confirmed were never provided.

156. Patient A.K. (Claim No. 0533359519) testified on April 29, 2019 that the only types of treatment she received at Healing Service PT were hot/cold packs, electrical stimulation, and massage.

157. A.K. expressly denied receiving any sort of exercise treatment at Healing Service PT for any dates of service as of her April 29, 2019 testimony.

158.  Prior to April 29, 2019, during the period A.K. denied any exercises were performed, Healing Service billed Allstate for purported therapeutic exercises on thirty-two (32) separate dates of service, therapeutic activities on thirty-two (32) separate dates of service, and neuromuscular reeducation on thirty (30) separate dates of service.

159.  A.K. further confirmed that she only went to Healing Service PT on Mondays, Wednesdays, and Fridays and did not receive treatment any other days of the week.

160.  Healing Service PT billed for numerous purported physical therapy modalities for A.K. on March 14, 2019 and April 18, 2019, both of which were Thursdays.

161.  Indeed, Healing Service PT's own purported "patient sign-in sheet" for March 2019 confirms A.K. did not present to the facility on March 14, 2019:



162.  Consistent with A.K.'s testimony, Healing Service PT's office manager confirmed that Healing Service PT is only open on Mondays, Wednesdays, and Fridays.

163.   However, Healing Service PT submitted numerous claims for purported treatment for multiple patients on Tuesdays, including on September 3, 2019, November 26, 2019, December 24, 2019, December 31, 2019, as well as Saturdays, including January 11, 2020. *See* Exhibit 1.

164.   Other defendants, including Faith PT, Happy Life, and Mirna PT, also billed Allstate for purported treatment on dates of service that the clinics were not open.

165.   Additional specific examples of patients for whom the defendants submitted bills for purported physical therapy modalities that were not performed at all include the following:

   a.   Patient N.D. (Claim No. 0496644501) reported that she appeared at Healing Service PT on April 9, 2018, but did not receive any examination or treatment that day. Healing Service PT still billed for its standard course of application of hot/cold packs, electrical stimulation, therapeutic exercises, therapeutic activities, and massage for N.D. on April 9, 2018, none of which were actually performed.

   b.   Core PT billed for purported ultrasound treatment on nineteen (19) separate dates of service for patient F.R. (Claim No. 0541876990). However, F.R. denied ever receiving ultrasound at Core PT.

   c.   Patient S.M. (Claim No. 0567754700) reported that he never received massage treatment at Faith PT and only received hot/cold packs on one (1) single date of service. Faith PT billed for massage treatment for S.M. on fourteen (14) dates of service and billed for application of hot/cold packs on thirteen (13) dates of service.

       d.    Patient N.K. (Claim No. 0548072965) reported that he never received electrical stimulation at Faith PT.  However, Faith PT billed for purported electrical stimulation treatment to N.K.

166.   Allstate is not required to pay the defendants for services that were not actually rendered and is entitled to restitution for payments it was induced to make by the defendants' fraudulent submissions.

## B.   BILLING FOR TIMED SERVICES NOT RENDERED

167.   As discussed further below, the defendants billed for nearly identical courses of physical therapy treatment for almost every patient, regardless of their age, alleged injury, and medical history.

168.   The majority of the treatments and modalities used in these protocol treatments were timed services for which each unit billed to an insurer represents fifteen (15) minutes of treatment.

169.   Medical coding rules require a minimum of eight (8) minutes of treatment be performed in order to bill for a unit of a timed service.

170.   To properly bill for multiple units of a timed service, a provider must perform the full fifteen (15) minutes of service for the first (and any subsequent) unit, and at least eight (8) minutes of service for the second (or subsequent) unit.

171.   However, numerous patients reported that their appointments lasted for periods far shorter than the timed treatments billed to Allstate by the defendants.

172.   Patients have also been observed entering and leaving the defendant clinics for periods of time shorter than the amount of timed treatment billed by the defendants.

173.   These discrepancies in timing are particularly significant because every appointment must have included non-billable actions, such as time for the patient to check in, breaks between exercises and modalities, and other unmonitored time during which patients did not perform timed treatments.

174.   Thus, each appointment would necessarily be longer than the delivery of timed services alone.

175.   Because the defendants billed relative to each patient for the same standard course of predetermined treatment modalities, each clinic implemented policies designed to present the appearance that a certain amount of timed treatment occurred in an effort to falsely justify their bills.

176.   For example, patient B.B. (Claim No. 0562501247) confirmed that Healing Service PT started a timer as soon as she entered the building and told her she had to remain in the facility for an hour:

> Q:   I'm trying to understand.  So there's people that come in and they don't do anything at all and then they leave?
>
> A:   No, because there's – like they just want to make sure everyone's there.  **Like when people walk in, that's when they'll start timing us.  Like we have to be there for an hour, you know.**  And then that's when they'll say, you know, "your time is up, you can go if you want."

(emphasis added).

177.   The exact minutes for each timed service must be separately billed and accurately recorded.

178.   Billing for patients' entire appointments as opposed to separately monitoring and documenting their individual exercises constitutes clear billing for services not rendered.

179.   As exemplified by Healing Service PT's improper policies, the defendants' failure to adequately monitor timed exercises resulted in them grossly overbilling Allstate for timed services that were not actually rendered, as evidenced by the numerous representative patients below whose appointments were much shorter than the purported treatment times billed by the defendants.

180.   For example, patient S.A. (Claim No. 0520597302) was observed on November 28, 2018 entering Happy Life and leaving the facility after exactly forty-seven (47) minutes.

181.   Happy Life nevertheless billed for 78 minutes of purported treatment to S.A. on November 28, 2018.

182.   S.A. also confirmed that she only spent fifteen (15) minutes in Happy Life's exercise room at each appointment, yet Happy Life billed for thirty (30) minutes of combined therapeutic exercises and therapeutic activities on each purported date of service.

33

183.   On April 5, 2019, patient A.K. (Claim No. 0533359519) was observed entering Healing Service PT and leaving after only thirty-three (33) minutes.

184.   Healing Service PT billed for 58 minutes of treatment for A.K. on April 5, 2019.

185.   A.K. was again observed entering Healing Service PT on May 6, 2019 and leaving after only twenty-two (22) minutes, yet Healing Service PT billed for 61 minutes of purported treatment for A.K. on May 6, 2019.

186.   Faith PT likewise failed to properly monitor and record timed exercises.

187.   Patient S.M. (Claim No. 0516026382) confirmed that a Faith PT employee "put me on a bike and tells me I can use it as much as I want" without recording this timed treatment modality.

188.   Faith PT also routinely submitted charges for timed treatment modalities with alleged treatment periods that exceeded the length of the patient's full appointment.

189.   For example, Faith PT alleged that it provided 78 minutes of treatment for each date of service of patient S.M. (Claim No. Z5228294) in June 2019:



190.   However, S.M.'s patient sign-in sheet routinely documented that his entire Faith PT appointment lasted less than 78 minutes:

| DATE | PATIENT SIGNATURE | TIME IN | TIME OUT |
|------|-------------------|---------|----------|
| 6-10-19 | | 1:30 | 2:45 |
| 6-11-19 | | 4:50 | 6:08 |
| 6-14-19 | | 4:31 | 5:41 |
| 6-17-19 | | 4:52 | 6:00 |
| 6-18-19 | | 4:25 | 5:35 |
| 6-20-19 | | 4:45 | 6:00 |
| 6-25-19 | | 11:50 | 1:00 |
| 6-27-19 | | 4:00 | 5:10 |
| 6-28-19 | | 4:00 | 5:10 |

191. By repeatedly billing for timed exercise periods greater than the total appointment time listed on patients' sign in sheets, Faith PT billed for extensive timed exercise modalities that were not and could not have been performed.

192. Further, the time in and time out columns on the defendants' sign-in sheets do not and cannot evidence that the patients were actually receiving treatment the entire time they were physically present at the clinics, as they would have necessarily spent time transitioning between modalities, transitioning between machines, taking breaks, and waiting for physical therapists to be ready to render treatment.

193. Because the defendants failed to time patients' individual exercises, they also frequently submitted charges for purported timed services that entirely failed to document the amount of time purportedly spent performing each timed service.

35

194. For example, Faith PT routinely billed for multiple units of timed exercises without providing any indication for how long the purported exercise was actually performed, instead simply writing "2" (for two (2) units) next to the exercise:



195. The exact time that exercises were allegedly performed needs to be specifically recorded and documented in the record, and bills for multiple units of timed treatment that fail to state the time to perform the exercises constitute billing for services not rendered.

196. Mirna PT likewise billed for multiple units of therapeutic exercises without documenting the actual time to perform the purported exercises on either the record or "flowsheet":



197.   Mirna PT billed for multiple units of therapeutic exercises, which require a minimum of twenty-three (23) minutes of treatment, for more than 97% of its bills that included purported therapeutic exercises.

198.   Olympic PT similarly failed to properly document its timed, one-on-one services billed to Allstate.

199.   For example, Olympic PT billed for fifteen minutes (one (1) unit) of therapeutic exercises for patient S.M. (Claim No. 0503171043) on June 22, 2020.

200.   However, for S.M.'s prior appointment on June 19, 2020, Olympic PT billed for thirty (30) minutes (two (2) units) of therapeutic exercises using identical exercises to those included on S.M.'s June 22, 2020 date of service, which confirms the records cannot possibly be accurate.

201.   Similarly, New Age PT routinely billed for multiple units of timed services that were not supported and were often directly contradicted by the allegedly exercises purportedly performed.

202.   For example, for alleged treatment to patient L.S. (Claim No. 0484347786) on July 14, 2017, New Age PT "documented" fifteen (15) minutes of purported exercise bike in addition to therapeutic exercises for L.S.'s back, neck, and shoulder, yet  reported the total time for therapeutic exercises as only twelve (12) minutes:

## TREATMENT

| MODALITIES | | | EXERCISES | | |
|---|---|---|---|---|---|
| **DESCRIPTION** | **CPT** | **UNIT** | **DESCRIPTION** | **REPS/TIME** | **SETS** |
| PT EVALUATION | 97163 | | Therapeutic exercises for Back | 10 reps | 2 |
| PT RE-EVALUATION | 97164 | | Therapeutic exercises for Neck | 10 reps | 2 |
| HOT / COLD PACK EA 15 MINS | 97010 | | Therapeutic exercises for Shoulder | 10 reps | 2 |
| MECHANICAL TRACTION | 97012 | | Therapeutic exercises for UE | | |
| ELECTRICAL STIMULATION EA 15 MINS | 97014 | 1 | Therapeutic exercises for Hip | | |
| PARAFFIN WAX | 97018 | | Therapeutic exercises for RT Knee (QUADRICEPS STRENGTHENING) | | |
| ULTRASOUND, (Neck)8 – 10 MINS | 97035 | 1 | Therapeutic exercises for LE | | |
| THERAPEUTIC EXERCISES, | 97110 | 1 | Shoulder Pulley | | |
| NEURO-MUSCULAR EDUCATION | 97112 | 1 | Shoulder Wheel | | |
| GAIT TRAINING | 97116 | | Exercise Bike | 15 min | 1 |
| MANUAL TRACTION | 97122 | | Treadmill | | |
| THERAPEUTIC MASSAGE 15 MINS | 97124 | | Therapeutic Ball Exercises | | |
| MANUAL THERAPY | 97140 | 1 | Mat Exercises | | |
| FUNCTIONAL ACTIVITIES, EA 15 MINS | 97530 | | Weights Exercises | | |
| ADLs TRAINING | 97535 | | PNF exercises for | | |
| EDUCATIONAL / TRAINING, 30 MINS | 98960 | 1 | HEP & Home safety | 10 mins | |
| ELEC STIM SUPPLIES, 2 LEADS | A4556 | | | | |

**SUBJECTIVE**
Patient reports pain to be at VAS=6/10 in cervical and lumbar region with activity. Patient has increased tension and muscle spasm in the paraspinal muscles of cervical and lumbar region.  Pt still presents with muscular tenderness in the right lattismus dorsi.

**OBJECTIVE FINDINGS, ASSESSMENT AND TREATMENT**
Ther Exs: 12 min to develop strength, endurance, ROM. including active neck exs, core stability exs, neck stretches, upper cervical muscle release, and Exercise bike

203.   About two (2) months earlier on May 9, 2017, New Age PT billed for one (1) less set of these identical therapeutic exercises for L.S.'s back, neck, and

shoulder, this time without the purported fifteen (15) minutes of exercise bike or any

other therapeutic exercises, yet somehow alleged that more treatment, fifteen (15)

minutes, had occurred than the July 14, 2017 date of service:

**TREATMENT**

| MODALITIES | | | | EXERCISES | | |
|---|---|---|---|---|---|---|
| DESCRIPTION | CPT | UNIT | | DESCRIPTION | REPS/TIME | SETS |
| PT EVALUATION | 97163 | 1 | | Therapeutic exercises for Back | 10 reps | 1 |
| PT RE-EVALUATION | 97164 | | | Therapeutic exercises for Neck | 10 reps | 1 |
| HOT / COLD PACK EA 15 MINS | 97010 | 1 | | Therapeutic exercises for Shoulder | 10 reps | 1 |
| MECHANICAL TRACTION | 97012 | | | Therapeutic exercises for UE | | |
| ELECTRICAL STIMULATION EA 15 MINS | 97014 | 1 | | Therapeutic exercises for Hip | | |
| PARAFFIN WAX | 97018 | | | Therapeutic exercises for RT Knee (QUADRICEPS STRENGTHENING) | | |
| ULTRASOUND, (Neck)8 – 10 MINS | 97035 | | | Therapeutic exercises for LE | | |
| THERAPEUTIC EXERCISES 15 MINS | 97110 | 1 | | Shoulder Pulley | | |
| NEURO-MUSCULAR EDUCATION | 97112 | | | Shoulder Wheel | | |
| GAIT TRAINING | 97116 | | | Exercise Bike | | |

204.    On July 12, 2017, New Age PT billed for thirty (30) minutes (two (2)

units) of purported therapeutic exercises for patient A.B. (Claim No. 0449847002)

corresponding to the following exercises:

| EXERCISES | | |
|---|---|---|
| DESCRIPTION | REPS/TIME | SETS |
| Therapeutic exercises for Back (McKenzie Extension Exs) | 15 reps | 1 |
| Therapeutic exercises for Neck (McKenzie Extension exercises) | 15 reps | 1 |
| Therapeutic exercises for Shoulder | 15 reps | 1 |
| Therapeutic exercises for UE | 15 reps | 1 |
| Therapeutic exercises for Hip | | 1 |
| Therapeutic exercises for RT Knee (QUADRICEPS STRENGTHENING) | 15 reps | 1 |
| Therapeutic exercises for LE | | |
| Shoulder Pulley | | |
| Shoulder Wheel | | |
| Exercise Bike | 15 min | 1 |
| Treadmill | | |
| Therapeutic Ball Exercises | | |
| Mat Exercises | | |
| Weights Exercises | | |

205.   However, about one (1) month earlier on June 14, 2017, New Age PT billed for four (4) of these exact same exercises, including identical reps/sets, without the shoulder and upper extremity exercises included in the July 12, 2017 record:

| DESCRIPTION | | | REPS/TIME | SETS |
|---|---|---|---|---|
| Therapeutic exercises for Back (McKenzie Extension Exs) | | | 15 reps | 1 |
| Therapeutic exercises for Neck (McKenzie Extension exercises) | | | 15 reps | 1 |
| Therapeutic exercises for Shoulder | | | | |
| Therapeutic exercises for UE | | | | |
| Therapeutic exercises for Hip | | | | |
| Therapeutic exercises for RT Knee (QUADRICEPS STRENGTHENING) | | | 15 reps | 1 |
| Therapeutic exercises for LE | | | | |
| Shoulder Pulley | | | | |
| Shoulder Wheel | | | | |
| Exercise Bike | | | 15 min | 1 |
| Treadmill | | | | |
| Therapeutic Ball Exercises | | | | |
| Mat Exercises | | | | |
| Weights Exercises | | | | |

206.   Despite documenting that fewer exercises were performed than the July 12, 2017 date of service, New Age PT billed for more treatment and charged for forty-five (45) minutes (three (3) units) of therapeutic exercises on June 14, 2017.

207.   As demonstrated by the patient testimony and records above, the defendants' failure to adequately monitor and record timed exercises resulted in the defendants' grossly overbilling Allstate for timed services that were not actually rendered.

208.   The defendants' rampant billing for timed services not performed is further confirmed by the numerous representative patients below who reported that

their appointments were much shorter than the purported treatment times billed by

defendants:

a. Patient N.T. (Claim No. 0523350320) reported his Core PT appointments only lasted around one (1) hour.  On each date of service for N.T., Core PT billed for 83 minutes of total treatment, which would not include N.T.'s time to check-in, breaks, and time switching between different exercises.

b. Patient S.A. (Claim No. 0520597302) reported that her Happy Life appointments only lasted one (1) hour.  Happy Life routinely billed for far more treatment, including charging for 83 minutes of treatment on January 4, 2019.

c. Patient B.R. (Claim No. 0531282622) was observed on April 5, 2019 entering Healing Service PT and leaving after exactly twenty-five (25) minutes.  Healing Service PT billed for 52 minutes of treatment for B.R. on April 5, 2019.  B.R. was again observed entering Healing Service PT on May 6, 2019 and leaving after only twenty-two (22) minutes, yet Healing Service PT billed for forty-six (46) minutes of purported treatment for B.R. on May 6, 2019.

d. Patient E.E. (Claim No. 0534762224) was observed on May 6, 2019 entering Healing Service PT and leaving after exactly twenty-five (25) minutes.  Healing Service PT billed for 54 minutes of treatment for E.E. on May 6, 2019.

209.   Allstate is not required to pay the defendants for treatment that was not

rendered for the amount of time required, if it was rendered at all, and is entitled to

repayment of monies it paid in reliance on the defendants' fraudulent submissions.

## C.   BILLING FOR EXERCISES REQUIRING ONE-ON-ONE SUPERVISION AND CONSTANT ATTENDANCE NOT PERFORMED

210.   The vast majority of the services billed by the defendants are classified by the American Medical Association's ("AMA") Current Procedural Terminology ("CPT")[2] Coding Manual as procedures mandating a "physician or therapist required to have direct (one-on-one) patient contact," including all therapeutic exercises, neuromuscular reeducation, manual therapy, therapeutic activities, and manual (constant attendance) electrical stimulation.

211.   These services expressly require direct, one-on-one, face-to-face supervision by a qualified healthcare professional for the entirety of treatment.

212.   A single therapist cannot provide "constant attendance" to multiple patients at the same time; instead, the mandatory one-on-one oversight must be constant and individualized between one patient and one licensed professional for the entire service period.

213.   The AMA further mandates that all one-on-one therapeutic procedures require the direct "application of clinical skill" provided by a qualified professional.

214.   Thus, a physical therapy facility cannot bill for treatment modalities that require direct, one-on-one supervision, including all therapeutic exercises,

---

[2] CPT codes are published by the American Medical Association to facilitate the efficient processing of healthcare charges by insurance carriers and other private and governmental healthcare payors.

neuromuscular reeducation, manual therapy, therapeutic activities, and manual electrical stimulation, if a patient can perform the procedure independently without skilled intervention.

215.   The defendants routinely billed Allstate for procedures requiring direct, one-on-one supervision and constant attendance when patients actually exercised on their own in a group setting without constant oversight or direct, one-on-one skilled contact from a licensed therapist.

216.   Indeed, numerous patients for whom the defendants billed Allstate for purported one-on-one, constant attendance treatment modalities reported that they exercised together with other patients in a group, with their exercises supervised, if at all, by one therapist passively watching multiple patients at the same time.

217.   Any time a therapist spends away from a patient, "direct" skilled contact was not provided and an exercise that requires one-on-one supervision and constant attendance cannot be billed.

218.   CPT Code 97150 ("*therapeutic procedure(s), group (2 or more individuals) (group therapy procedures involve constant attendance of the physician or other qualified healthcare professional [ie, therapist], but by definition do not require one-on-one patient contact by the same physician or other qualified healthcare professional)*") is the proper code for group therapy and must be billed when one (1) therapist monitors multiple patients exercising together.

219. However, Healing Service PT, Core PT, Faith PT, Happy Life, Mirna PT, New Age PT, and Olympic PT never submitted a single charge for group therapy to Allstate.

220. Instead, the defendants improperly billed for multiple units of alleged one-on-one, constant attendance exercises that were not actually performed because these procedures can be billed for multiple units for each patient and thus generate higher charges to Allstate than a single group therapy charge.

221. Group therapy in which one (1) therapist supervises multiple patients is an untimed code and therefore group therapy can only be billed once per patient per date of service.

222. By fraudulently billing multiple units of constant attendance modalities for each patient that were not performed instead of billing only one (1) unit of group therapy, the defendants dramatically increased their total charges to Allstate.

223. For example, patient M.H. (Claim No. 0484646674) confirmed that Healing Service PT's therapist worked with other patients while he exercised:

> Q: Does she ever have any other patients there with you?
>
> A: She watches - - **she watches all of us**. She takes cares of them as well. **She takes, she just watches all of us**.
>
> Q: Okay. **So, there are more than one patients there that she is taking care of?**
>
> A: **Oh, yeah. Of course, yeah**.

(emphasis added).

224. Healing Service PT billed for therapeutic exercises, therapeutic activities, neuromuscular reeducation, and manual therapy, all of which require constant, one-on-one therapist supervision and skilled direct contact, on 102 separate dates of service for M.H.

225. Patient N.B. (Claim No. 0533790374) reported that he was left on his own at Healing Service PT to exercise without constant supervision or one-on-one contact while one (1) Healing Service PT therapist worked with numerous other patients.

226. Healing Service PT billed for purported therapeutic exercises for N.B. on thirty-three (33) dates of service, neuromuscular reeducation on thirty-three (33) dates of service, and therapeutic activities on thirty-three (33) dates of service, all of which are one-on-one services that require a therapist's constant supervision and direct contact.

227. Patient S.M. (Claim No. 0516026382) reported that she and her two (2) sons, L.E. and L.E., all exercised together with the same therapist at Faith PT.

228. Faith PT never billed relative to S.M., L.E., and L.E. for a single unit of group therapy and instead billed purported one-on-one therapeutic exercises on twenty-three (23) of the same dates of service, which could not have possibly been provided by one therapist working with all three (3) patients at the same time.

229.   Patient F.R. (Claim No. 0541876990) reported that exercises at Core PT were performed in a "big hall with lots of machines" together with many other patients.

230.   F.R. confirmed he exercised independently while one (1) Core PT employee attempted to monitor the entire group without providing any patient constant oversight or direct, one-on-one skilled contact.

231.   Core PT uniformly billed for therapeutic exercises and manual electrical stimulation for F.R., both of which require one (1) therapist to provide one (1) patient constant, one-on-one attendance and direct patient contact.

232.   Patient A.Y. (Claim No. 0483725073) reported that he never received constant, one-one-one treatment while he exercised at Healing Service PT.

233.   One (1) Healing Service PT employee always rotated between multiple patients leaving the patients to exercise on their own for the majority of their exercise period.

234.   Healing Service PT billed for a combination of therapeutic exercises, manual therapy, and therapeutic activities for each of A.Y.'s 64 dates of service, all of which are one-on-one exercises that require direct skilled contact from a therapist providing constant supervision.

235.   Patients A.A. and A.P. (Claim No. 0572792554) were a mother and daughter that were allegedly involved in the same motor vehicle accident on

December 24, 2019 and both reported to Mirna PT for purported physical therapy together on the same dates of service.

236.   Mirna PT billed for the same therapist, Ashish Salvi, purportedly performing multiple units of therapeutic exercises, which require constant attendance and one-on-one skilled contact, for both A.A. and A.P. on each date of service.

237.   However, Salvi routinely signed A.A. and A.P.'s treatment records at nearly identical times, for example 4:49 PM for A.P. and 4:52 PM for A.A. on February 3, 2021, which confirms that both patients actually worked with Salvi at the same time and neither received constant attendance or one-on-one supervision.

238.   By billing for multiple units of one-one-one, constant attendance therapeutic procedures that were not actually performed, the defendants generated millions of dollars in charges for therapeutic exercises, neuromuscular reeducation, manual therapy, therapeutic activities, and manual electrical stimulation alone.

239.   Allstate is not required to pay the defendants for one-on-one, constant attendance services that were not actually rendered and is entitled to restitution for payments it was induced to make by the defendants' fraudulent submissions.

### D.   BILLING MULTIPLE TIMES FOR THE SAME SERVICE

240.   The defendants also routinely billed Allstate for multiple units of untimed treatments that are only permitted to be billed once per date of service.

241.   Healing Service PT and New Age PT billed Allstate for multiple units of unattended electrical stimulation on patients on the same date of service.  *See* Exhibits 1 and 3.

242.    Unattended electrical stimulation billed using CPT Code 97014 is not a timed code and cannot be billed multiple times on a single date of service, yet both Healing Service PT and New Age PT routinely charged multiple units to improperly generate higher bills to Allstate.

243.   Healing Service PT also billed Allstate for allegedly applying hot/cold packs, an untimed service, to patients more than once on numerous dates of service. *See* Exhibit 1.

244.   Submission of multiple bills for the same service on the same date when coding rules prohibit more than one bill constitutes billing for services not rendered.

### E.   BILLING FOR PATIENT EDUCATION/TRAINING NOT PERFORMED

245.   New Age PT routinely billed for patient education and training using CPT Code 98960, which requires a minimum of thirty (30) minutes of face-to-face time between the provider and patient.

246.   For the vast majority of New Age PT patients, CPT Code 98960 was billed despite New Age PT performing far less than thirty (30) minutes of patient education and training, which constitutes billing for services not rendered.

247.   Further, patient education and training is specifically focused on educating patients for self-management and transitioning patients towards a home exercise curriculum.

248.   In addition to failing to perform the required thirty (30) minutes of patient education and training, New Age PT repeatedly billed for purported patient education and training over extended periods without transitioning patients to home exercises.

249.   For example, New Age PT billed for alleged patient education and training for forty-two (42) dates of service over a nearly five (5) month period for patient F.A. (Claim No. 0455701342) between May through September 2017.

250.   Throughout this same period, New Age PT also continued to bill for the same, unchanged physical therapy modalities without transitioning F.A. to home exercises.

251.   Allstate is not required to pay New Age PT for patient education and training that was not actually provided and is entitled to restitution for payments it was induced to make by New Age PT's fraudulent submissions.

**F.   SPECIFIC EXAMPLES OF BILLING FOR SERVICES NOT RENDERED**

252.   In addition to the fraudulent practices detailed above, each of which were standard practices of the defendants that resulted in numerous bills submitted to Allstate for payment for physical therapy services not actually performed, the

defendants faxed and mailed fraudulent bills and medical records relative to each of

the following representative exemplar patients:

a.  Healing Service PT billed for two (2) units of therapeutic activities for patient M.H. (Claim No. 0484646674) for seventeen (17) separate dates of service in July and August 2018, which would have required a minimum of twenty-three (23) minutes of treatment on each date of service. However, M.H. did not receive twenty-three (23) or more minutes of therapeutic exercises on any of these seventeen (17) dates of service. On an additional twenty-five (25) dates of service between December 15, 2017 and February 15, 2018, Healing Service billed for therapeutic activities to patient M.H. that were not performed at all.

b.  New Age PT billed for two (2) units of therapeutic exercises for patient L.S. (Claim No. 0484347786) on May 10, 2017, May 16, 2017, May 31, 2017, and June 9, 2017, which would have required a minimum of twenty-three (23) minutes of treatment on each date of service. However, L.S. did not receive twenty-three (23) or more minutes of therapeutic exercises on any of these dates of service.

c.  New Age PT billed for two (2) units of therapeutic exercises for patient S.K. (Claim No. 0445439193) on August 15, 2017, which would have required a minimum of twenty-three (23) minutes of treatment. However, S.K. did not receive twenty-three (23) or more minutes of therapeutic exercises on August 15, 2017.

d.  Defendant Healing Service PT billed for therapeutic activities for patient M.O. (Claim No. 0475722930) on twelve (12) separate dates of service in October 2017. Contrary to these bills, therapeutic activities were never actually performed by Healing Service PT.

e.  Patient Y.A. (Claim No. 0483357398) expressly denied receiving any type of electrical stimulation treatment at Healing Service PT. Healing Service PT billed for purported electrical stimulation for Y.A. on 84 separate dates of service.

f.    Faith PT billed for massage treatment for patient R.A. (Claim No. 0504578741) on forty (40) separate dates of service. However, R.A. expressly denied receiving massage treatment at Faith PT on any date of service.

g.    New Age PT billed for purported "education and training" for patient R.Y. (Claim No. 0546710187) using CPT Code 98960 on May 29, 2019, which requires a minimum of thirty (30) minutes of treatment.  However, New Age PT performed, at most, only fifteen (15) minutes of education training on May 29, 2019.

h.    New Age PT billed for purported "education and training" for patient L.S. (Claim No. 0484347786) using CPT Code 98960 on May 9, 2017, which requires a minimum of thirty (30) minutes of treatment.  However, New Age PT performed, at most, only ten (10) minutes of education training on May 9, 2017.

i.    Patient M.D. (Claim No. 0501141543) reported that she only presented to Core PT one (1) time and did nothing besides sit in a massage chair with a hot pack.  Core PT additionally billed for ultrasound treatment, which constitutes billing for services not rendered.

j.    Patient A.Y. (Claim No. 0483725073) reported that he only received electrical stimulation treatment one (1) time, as he did not like the treatment and refused to receive it again.   Healing Service billed for purported electrical stimulation for A.Y. on 62 separate dates of service.

k.    Patient L.A. (Claim No. 0493192439) reported that he exercised on his own at Core PT without constant therapist supervision or intervention.   L.A. further described his alleged electrical stimulation as unattended, as a Core PT employee set a timer then left the room for the entirety of his electrical stimulation treatment.  Despite not providing constant supervision for his therapeutic exercises or constant attendance for his electrical stimulation, Core PT billed for constant attendance electrical stimulation on thirty-one (31) separate dates of service and one-

on-one therapeutic exercises on thirty (30) separate dates of service.

l.   Patient N.T. (Claim No. 0523350320) reported that his Core PT therapist left the room while he received electrical stimulation on his own.  Because it could be billed at a higher rate than unattended electrical stimulation, Core PT billed for constant attendance electrical stimulation on forty-two (42) separate dates of service.

m.   Patient A.T. (Claim No. 0529155095) confirmed that her electrical stimulation at Core PT involved an employee setting a timer then leaving the room.  Core PT billed for constant attendance electrical stimulation that never occurred on thirty-two (32) dates of service for A.T.

## VI.   PATIENT SOLICITATION AND KICKBACKS

### A.   MICHIGAN'S ANTI-SOLICITATION LAWS

253.   The solicitation and exploitation of motor vehicle accident victims for profit or professional gain is strictly prohibited in the State of Michigan, as is the use of factors other than legitimate medical judgment to bill insurers.

254.   Michigan law prohibits "[a]ny physician or surgeon engaged in the practice of medicine in this state" from "employ[ing] any solicitor, capper, or drummer for the purpose of procuring patients."  Mich. Comp. Laws § 750.429.

255.   Other conduct prohibited under Michigan law ranges from the identification and solicitation of potential patients of medical providers, to the use of agents to solicit patients, and to the receipt of fees obtained through such fraudulent methods, including the mere participation in any schemes relating to such

activity.  *See* Mich. Comp. Laws §§ 750.410b, 750.429, 257.503, and 500.4503(h)-(i).

256.   It is also illegal in Michigan to contact any motor vehicle accident victim to offer a service within thirty (30) days of the accident, Mich. Comp. Laws § 750.410b, and to use police reports to solicit any person identified in the report, Mich. Comp. Laws § 257.503(1)(a).

257.   Only "lawfully-render[ed] treatment" is compensable under Michigan's No-Fault Act.  Mich. Comp. Laws § 500.3157(1).

258.   As set forth more fully below, the defendants participated in and willingly benefited from schemes to solicit patients through conduct prohibited under Michigan law, including unlawful kickback payments.

### B.   IMPROPER AND UNLAWFUL METHODS USED TO SOLICIT PATIENTS

#### 1.   Kickbacks

259.   One of the primary methods the defendants used to solicit patients was aggressively targeting patients with offers of cash and in-kind payments in exchange for presenting to the defendant physical therapy clinics.

260.   Several individuals have reported to Allstate that the kickback payments offered by the defendants are well known in their community, and have been a regular aspect of the defendants' businesses since at least 2017.

261.   Patient N.K. (Claim No. 0548072965) testified that himself, as well as his son and daughter who were also allegedly involved in the same motor vehicle accident, were all offered $1,000 each from Faith PT if they remained in therapy at Faith PT for at least three (3) months:

Q.   Did either the doctor or the physical therapy place or the guy from church offer you money to keep pursuing some kind of claim related to this accident?

A.   My understanding was **if we stayed three months in therapy and continue with them** and do all the MRIs, each one three of them, **they would give us $1,000 each**.

Q.   Who told you that?

A.   **The guy that took us to therapy**.

Q.   Did the guy who said you would get $1,000 say who he would get the money from?

A.   **Supposedly from therapy.  He would take it from them.**

262.   N.K. confirmed that he was not asked where he would like to receive physical therapy treatment or if he even needed physical therapy, but was immediately transported to Faith PT where he was offered payment for himself and his two (2) young children to pursue treatment that they did not need.

263.   These types of cash payments played an integral role in the defendants' scheme because they incentivized patients to continue on the defendants' predetermined course of excessive physical therapy treatment.

264.   The defendants' extensive use of kickbacks is also evidenced by their financial records.

265.   For example, defendant Faith PT made at least 265 separate cash withdrawals from one of its bank accounts from January 5, 2018 to September 29, 2020, totaling more than $1 million dollars.

266.   Faith PT's bank records reflect that all of its normal business expenses, including wages, contract payments to therapists, and rent, were paid through checks written for these purposes.

267.   In other words, the cash withdrawals from Faith PT's bank account could not have been for normal expenses related to operation of a physical therapy clinic, because all of those expenses are accounted for by other documented payments.

268.   Moreover, Faith PT's cash withdrawals were structured to avoid detection and reporting requirements by always limiting to less than $10,000.

269.   However, Faith PT frequently made large cash withdrawals on consecutive days, and often on the same date.

270.   These types of regular, unexplainable cash transactions are a hallmark of medical providers who operate through payments of kickbacks to patients and for patient referrals.

271.   Faith PT's bank records also reflect that the business was funded by an individual named Joseph Awada, who is the uncle of Faith PT's manager Mariam Cheikh, and who owns and controls several other physical therapy clinics that use cash payments to patients to induce them to pretend to undergo treatment. *See* Liberty Mutual Fire Insurance Company, *et al*. v. Relief Physical Therapy & Rehab, Inc., *et al*., 19-cv-12648-SDD-RSW (E.D. Mich.).

272.   Indeed, several of the records submitted by or on behalf of Faith PT to induce Allstate to pay its fraudulent claims were faxed from Joseph Awada's business, Relief Physical Therapy & Rehab, Inc.

273.   Olympic PT's bank records also reveal numerous cash transactions that can only be explained as kickbacks to solicitors and patients.

274.   Further, despite Mirna Kakos being the ostensible owner of Olympic PT (and Mirna PT), the checks written from Olympic PT's bank account are nearly uniformly signed by defendant Thaer Kakos.

275.   The Kakos family has a lengthy history of participating in schemes to pay kickbacks to patients in exchange for seeking physical therapy treatment.

276.   On December 18, 2013, Mirna Kakos's brother, Andrew Thaer Kakos, was arrested for assaulting the owner of a clinic called Utica Physical Therapy.

277.   According to statements given to the police, the assault was precipitated by the owner of Utica Physical Therapy failing to pay Andrew Thaer Kakos (a layperson) for sending patients to the clinic.

278.   Many of the Olympic PT checks were written to "Cash," and were signed by Thaer Kakos as both the payor and the payee, which further confirms that these checks were simply used for immediate cash transactions.

279.   Other litigation involving the defendants and their associates has also identified their use of kickback payments to induce patients to seek treatment they did not need.

280.   Hemal Bhagat, who is the husband of Core PT owner Payal Bhagat (and former owner of Sterling PT along with defendant New Age PT's incorporators Khalid Gazguz and Hansee Sesi), was indicted for healthcare fraud in January 2013 in relation to a scheme that involved paying kickbacks to patient recruiters and physicians to increase Medicare patients.  *See* United States of America v. Aamir, *et al.*, 2:13-cr-20039-BAF-MKM (E.D. Mich. 2013).

281.   In November 2016, Hemal Bhagat was convicted of conspiracy to commit healthcare fraud, for which he was sentenced to thirty (30) months in prison and ordered to pay $4.7 million dollars in restitution.

282.   As part of this conspiracy, Hemal Bhagat and his co-conspirators paid kickbacks and bribes to recruiters, who then offered and provided kickbacks and

bribes to patients to incentivize treatment as well as to physicians in exchange for predetermined referrals, all of which are practices employed by the defendant clinics here.

## 2.    Unlawful Patient Solicitation

283.   Despite Michigan's prohibition on patient solicitation, the defendants actively employed a number of unlawful and improper methods to obtain patients.

284.   Core PT employed defendant Elia in a "marketing" role, which in reality involved patient solicitation and recruitment.

285.   Core PT likewise employed an individual named Martin Dahhoo ("Dahhoo"), who personally attempted to abuse the Michigan No-Fault Act by submitting claims for five (5) separate alleged motor vehicle accidents between 2015 and January 2018.

286.   All of these alleged accidents involved highly suspicious circumstances, with several described by Dahhoo as having allegedly occurred in the same location with nearly identical details and "phantom" vehicles that were not identified in any police report and could not be described.

287.   In addition to his own staged motor vehicle accident activity, Dahhoo has testified to his extensive knowledge of insurance fraud in Michigan, including identifying numerous physical therapy, pain management, and MRI facilities that made payments to patients in exchange for treatment.

288.   Dahhoo identified Afan, another former layperson employee of Core PT and an owner of one of the defendants' primary prescription sources, Star Pain, as an individual who paid kickbacks to patients and arranged for patients to receive payment for treatment.

289.   Dahhoo has no medical education, training, or licenses, and was employed by Core PT solely for patient solicitation.

290.   Other defendants utilized similar solicitation tactics to target individuals in the immediate aftermath of their alleged motor vehicle accidents (in violation of Michigan law) and direct them to the defendants' network of physical therapy clinics.

291.   For example, patient N.K. (Claim No. 0548072965), who testified to receiving an offer for cash payments from Faith PT in exchange for three (3) months of physical therapy, testified that he was approached by a stranger who "witnessed" his motor vehicle accident.

292.   This man followed N.K. home from the motor vehicle accident and told him that he would return in a few days to provide N.K. transportation to pursue medical treatment.

293.   This same individual who approached N.K. immediately following his alleged motor vehicle accident did eventually transport him to Faith PT, and N.K. confirmed that this unknown individual appeared to be associated with Faith PT

since he offered to pay him with money that he claimed would be provided by Faith PT.

294.   S.M., R.M., and R.M. (Claim No. Z5228294) were allegedly involved in a motor vehicle accident on June 5, 2019, and all three (3) reported that they attempted to present for evaluation at the urgent care clinic run by defendant Siddique.

295.   While in the waiting room at Siddique's clinic, S.M., R.M., and R.M. were approached by an individual who claimed to have been in a "similar situation" and provided them with business cards for AMC and Faith PT.

296.   Each claimant was allegedly seen at AMC, where they were immediately prescribed physical therapy at Faith PT.

297.   The improper solicitation and referral relationship between AMC and Faith PT is further confirmed by the fact that AMC's initial examination record for each patient explicitly confirms that the referral was to Faith PT, rather than for physical therapy at a clinic chosen by the patients:

**REFERRALS:**
Faith PT via Fax

298.   Patient B.S. (Claim No. 0504047838), a relative of Happy Life's owner Nicholas Sesi, was allegedly involved in a motor vehicle accident on May 19, 2018.

299.   B.S. did not report to the emergency department or seek any sort of treatment immediately following the purported motor vehicle accident and, prior to

being evaluated by a physician or receiving any physical therapy referral, B.S. was allegedly driven by a "family member" to Happy Life.

300.   The defendants concealed their illegal solicitation by coaching patients to provide Allstate with vague and false reports of how they were referred to the defendant clinics.

301.   Many of the patients at issue herein reported to Allstate that they were referred to the defendant clinics by friends, but were unable to recall the names of these alleged "friends" from whom they purportedly sought and accepted medical advice.

302.   All of the defendants' bills for patients that were unlawfully and improperly induced to seek medical treatment that they did not actually need and that they did not seek out of their own volition were not medically necessary and are non-compensable under Michigan's No-Fault Act.

## VII.   UNLAWFUL AND UNLICENSED TREATMENT AND SERVICES

303.   The defendants also violated several Michigan laws and regulations in their effort to bill Allstate as much as possible.

304.   Defendants Happy Life and Faith PT routinely billed Allstate for the purported issuance of durable medical equipment ("DME") to patients at issue herein without possessing the licensure required by the State of Michigan.

305. In order to legally issue DME in Michigan, a provider must obtain a license from the Michigan Board of Pharmacy.

306. A license from the Michigan Board of Pharmacy is required for all "drugs **and devices** manufactured, distributed, prescribed, dispensed, administered, or **issued in this state** . . . ." Mich. Comp. Laws § 333.17722 (emphasis added).

307. Both Happy Life and Faith PT never possessed licenses to issue DME in the State of Michigan.

308. Not only was this DME medically unnecessary, discussed further *infra*, it was unlawful and not compensable under the No-Fault Act.

309. On April 14, 2021, a Happy Life representative reported to Allstate that the clinic does not distribute DME, which further confirms that all of its charges for DME are unlawful.

310. Allstate is not required to pay Happy Life and Faith PT for unlicensed DME and is entitled to restitution for payments it was induced to make by Happy Life's and Faith PT's fraudulent bills.

## VIII. UNREASONABLE AND UNNECESSARY FRAUDULENT TREATMENT

311. The defendants' willingness to bill Allstate for services that were (1) never rendered, (2) induced by kickbacks, solicitation, and other unlawful and improper actions, and (3) not lawfully provided demonstrates their willingness to also bill for treatment that was unreasonable and unnecessary.

312.   The defendants' goal was to bill for as much physical therapy treatment as possible, regardless of whether such treatment was reasonably necessary to patients' care, recovery, or rehabilitation, in order to generate bills for submission to Allstate.

313.   The defendants routinely billed for the same standard course of physical therapy modalities, namely, timed therapeutic procedures that the defendants could bill for multiple units, because these specific modalities allowed them to maximize profit for treatments that were not necessary and were not even performed.

314.   The defendants' purported treatment violated established standards of care in the medical community, as their physical therapy treatment was not indicated, redundant, excessive, and repeated without any objectively documented benefit to patients.

315.   The full extent and pattern of the defendants' misrepresentations regarding the lawfulness and necessity of the treatment they allegedly provided was not known to Allstate until it undertook the full investigation that culminated in the filing of this action, including identification of the defendants' pattern of overtreatment.

316.   The unnecessary treatment billed by the defendants, discussed more fully below, includes the treatment and patients set out in the charts annexed hereto at Exhibits 1 through 7.

317.  All of the bills submitted by the defendants to Allstate through the U.S. Mail and interstate wires seeking payment for unnecessary, excessive, unlawful, and unreasonable treatment are fraudulent.

318.  Allstate is not required to pay the defendants for treatment that was medically unnecessary, and it is entitled to the return of money paid in reliance on the defendants' fraud.

319.  None of the above facts were known to Allstate until it undertook its investigation that resulted in the commencement of this action, and are not evident within the four corners of the medical records and bills submitted to Allstate by the defendants.

## A.  THE DEFENDANTS' PREDETERMINED TREATMENT PROTOCOL

320.  Allstate's investigation revealed a strikingly similar pattern of alleged diagnoses and treatment across all patients, including the discovery of a pattern by the defendants in (1) routinely recording substantially similar (exaggerated) findings and diagnoses regardless of each patient's reported injuries; (2) providing mirrored treatment plans; and (3) failing to indicate short- and/or long-term goals for patients.

321.  The defendant clinics and their owners and managers (i.e., the individual defendants) billed Allstate for physical therapy treatment that far exceeded applicable standards of care.

322. Valid orders for physical therapy treatment require the services be objectively indicated and cannot be based on a patient's subjective complaints of pain alone.

323. In the vast majority of motor vehicle accident cases, mild injuries will resolve themselves within a few weeks without any treatment.

324. The defendants' immediate resort to physical therapy using a predetermined protocol of excessive treatment was not related to the care, recovery, or rehabilitation of the patient, and billing for such services was medically unnecessary and not compensable under the Michigan No-Fault Act.

325. Moreover, the defendants' immediate resort to extensive treatment may have caused harm to the patients at issue herein, as acute processes of injury were not allowed to dissipate naturally and follow the expected course of recovery.

326. Because physical therapy exceeding twenty-one (21) days or ten (10) visits must be prescribed by a licensed medical or osteopathic doctor pursuant to Mich. Comp. Laws § 333.17820(1), the defendant physical therapy clinics required the participation of defendant Siddique and other pain management facilities.

327. As detailed above, Siddique and the other physicians who wrote the prescriptions used by the defendants did not actually monitor the patients' progress in physical therapy and, in many cases, did not even evaluate the patients at all before writing *pro forma* prescriptions to allow the defendants to bill Allstate.

328.   Immediate referrals for medically unnecessary physical therapy at the defendant clinics are exemplified by the following representative patients:

a.   Patient F.E. (Claim No. 0490255049): Allstate was billed for alleged treatment at Core PT on January 31, 2018 based on a referral from Siddique, which was only one (1) day after F.E.'s purported motor vehicle accident.

b.   Patients D.K. and M.K. (Claim No. 0520129479): Both D.K. and M.K. were prescribed physical therapy by Siddique, who did not bill for an actual examination, on October 11, 2018, only two (2) days after a purported motor vehicle accident. The next day, October 12, 2018, Allstate was billed for alleged treatment at Healing Service PT based on Siddique's referral.

c.   Patients N.K., N.K., and Y.K. (Claim No. 0548072965): Allstate was billed for purported initial evaluations for all three (3) patients at a pain management facility on June 6, 2019, which was only three (3) days after an alleged motor vehicle accident. Physical therapy at Faith PT was billed for all three (3) patients starting the following day, June 7, 2019.

d.   Patient R.B. (Claim No. 0563222025): Allstate was billed for physical therapy by Happy Life beginning on October 4, 2019, only two (2) days after R.B.'s alleged October 2, 2019 motor vehicle accident.

e.   Patient M.K. (Claim No. 0476940846): Allstate was billed for a purported initial evaluation at a pain management facility on October 2, 2019, which was only two (2) days after M.K.'s alleged motor vehicle accident. Physical therapy at New Age PT was billed beginning the same day, October 2, 2019.

f.   Patient Q.Y. (Claim No. 0563618131): Allstate was billed for physical therapy at Mirna PT on October 9, 2019, only five (5) days after Q.Y.'s alleged October 4, 2019 motor vehicle accident.

### 1.   **Fabricated Examination Findings**

329.   Once referred to the defendant clinics, patients' complaints and findings were routinely exaggerated and fabricated in an attempt to create the appearance of injury as a false justification for the extensive courses of treatment ordered.

330.   One type of form that was fabricated by Faith PT was "range of motion evaluation charts" that listed purported limitations to patient movement.

331.   That these forms were wholly made up by Faith PT is evidenced by the fact that it submitted multiple forms purporting to record range of motion limitations on the same dates but that claimed significantly different levels of injury.

332.   For example, Faith PT submitted two separate range of motion evaluation charts for patient R.M. (Claim No. Z5228294) that documented different purported back, lateral (flexion), neck, neck (lateral bending), and neck (rotation) findings for the same June 10, June 11, June 14, June 17, June 18, and June 20th dates of service:





333.   Other instances of the defendants' fabrication of examination findings are evidenced by the significantly different reports made by other physicians regarding the same patients.

334.   For example, Patient L.E. (Claim No. 0475969977) was an eight (8) year old who was allegedly involved in a motor vehicle accident on September 19, 2017 and immediately reported to Beaumont Health System where he denied any neck, back, or chest pain.

335.   L.E.'s Beaumont Health System examination determined he exhibited a normal range of motion in his neck and no back tenderness.

336.   L.E. returned to Beaumont one (1) week later on September 26, 2017, where his evaluation again determined he showed a normal neck and musculoskeletal range of motion and confirmed L.E. was moving around normally.

337.   L.E. also expressly denied any pain when questioned at Beaumont.

338.   The very same day L.E. denied any pain or injury from the alleged motor vehicle accident, L.E. was transported to Healing Service PT, where his initial examination starkly contradicted Beaumont's findings and claimed L.E. experienced pain of 6-7/10, severely diminished cervical spinal muscle strength of only 3/5, and 15% reduced range of motion in his neck.

339.   Based on these fabricated examination findings, Healing Service PT billed for 59 separate appointments over more than four (4) months for this eight (8) year old patient.

340.   During this period, Healing Service PT prescribed its standard course of physical therapy including extensive physical exercises that were not adjusted or changed despite L.E.'s young age.

341.   The range of motion ("ROM") and motor muscle tests ("MMT") findings that were fabricated for patient L.E. were routinely used by the defendants to create the appearance of injury where none existed.

342.   MMTs are scored using the Oxford Scale, as described on the chart below:

| Grade | Observation |
|:---:|:---|
| 0 | No muscle contraction is detected. |
| 1 | A trace contraction is noted in the muscle by palpating the muscle while the patient attempts to contract it. |
| 2 | The patient is able to move the muscle when gravity is eliminated. |
| 3 | The patient may move the muscle against gravity but not against resistance from the examiner. |
| 4 | The patient may move the muscle group against some resistance from the examiner. |
| 5 | The patient moves the muscle group and overcomes the resistance of the examiner.  This is normal muscle strength. |

343.   As demonstrated by the example of patient L.E. above, the MMT scores reported by the defendant clinics reflect patients who allegedly presented with crippling injuries, not the (at most) minor soft-tissue injuries (or no injuries at all) that were reported by other physicians simultaneously treating the patients and the patients themselves.

344.   The significantly diminished muscle strength reported by the defendant clinics, which often were directly contradicted by contemporaneous findings recorded by physicians outside of the defendants' scheme, were used to falsely create the appearance of necessity for the defendants' excessive courses of physical therapy billed for all patients pursuant to an established predetermined treatment protocol.

345.   Several additional representative examples of the defendant clinics' reports of exaggerated injuries and limitations are set forth below:

a.   Patient A.N. (Claim No. 0500933429) was allegedly involved in a motor vehicle accident on April 29, 2018.  There was minimal damage to A.N.'s vehicle, and A.N. traveled in the vehicle to Oaklawn Hospital where she was evaluated and determined to show no sign of significant injury with "no head or neck discomfort . . . no spinal tenderness . . . range of motion of head, neck, and back without evidence of discomfort."  A.N. then waited more than two (2) weeks before reporting to a pain management clinic on May 14, 2018, where she was immediately referred to Healing Service PT.  In contradiction to A.N.'s Oaklawn Hospital examination, Healing Service alleged A.N. experienced severe pain of 8/10 and exhibited diminished muscle strength of 3/5 in her cervical/lumbar/thoracic spine.  Healing Service PT billed for nearly six (6) months of treatment until A.N. inexplicably switched to Core PT on October 10, 2018, which immediately began billing for many of the same physical therapy treatment modalities billed by Healing Service.  Despite Healing Service PT's near six (6) months of purported physical therapy treatment, Core PT's initial examination alleged that A.N. showed a highly similar muscle strength score of 3+/5 throughout her spine.  After Core PT billed for nearly one (1) month of treatment, A.N. was evaluated at a separate pain management facility on December 5, 2018 where she was found to exhibit 5/5 muscle strength throughout her spine.  A.N. then

allegedly returned to Healing Service PT, where the defendant billed for another nine (9) months of alleged treatment from November 2018 through August 2019. On August 29, 2019, after multiple defendant clinics had billed A.N. for more than one (1) year and three (3) months of continuous physical therapy, A.N.'s neck and back pain was reported as 9/10, which indicates that her condition had gotten worse since her initial Healing Service PT visit on May 18, 2018.

b.   Patient S.M. (Claim No. 0503171043) was allegedly involved in a motor vehicle accident on May 21, 2018. S.M. did not seek treatment at the hospital or call police to the scene of the alleged accident. Four (4) days later, S.M. allegedly presented to a pain management facility where she reported neck pain of only 4/10. S.M. was found to exhibit full cervical and lumbar range of motion as well as muscle strength of 5/5 throughout her spine. Despite her minor pain and lack of any muscle strength or range of motion limitations, S.M. was referred to Happy Life where she was first allegedly seen on May 30, 2018. Happy Life claimed that S.M.'s pain was a far more severe 7/10 and also alleged numerous purported injuries not diagnosed during her examination only five (5) days earlier, including new pain in her shoulders, left knee, and lower extremities. Happy Life further claimed that S.M.'s lumbar muscle strength was an extremely limited 3+/5. S.M. continued her alleged treatment until in or about October 2018, when she stopped seeking any treatment related to her motor vehicle accident. Indeed, S.M. testified on December 16, 2019 that she was no longer seeking medical treatment. Then, S.M. inexplicably met with Siddique on January 22, 2020, who immediately prescribed physical therapy without performing an examination. S.M. allegedly presented to Olympic PT on January 22, 2020, where she was alleged to exhibit severe pain of 7/10, range of motion restricted as much as 30%, and crippling muscle strength limitations of 3-/5 in her cervical spine. Based on these exaggerated findings, Olympic PT billed Allstate for more than eight (8) months of purported physical therapy all supposedly relating back to S.M.'s purported May 21, 2018 motor vehicle accident for which she had stopped treatment more than a year prior.

c.      Patient S.J. (Claim No. 0541414769) was allegedly involved as a passenger in a motor vehicle accident on April 10, 2019, at which time she was only twelve (12) years old.  On that date, S.J. was evaluated at a hospital where she reported no spinal pain and was determined to have normal range of motion in her neck, lumbar spine, cervical spine, and entire musculoskeletal area. However, when S.J. was referred to Happy Life just weeks later, it was claimed that she experienced far more debilitating muscle strength limitations of 3/5 in her cervical and lumbar spine as well as range of motion restrictions throughout her spine.  Based on these exaggerated findings, Happy Life ordered its standard course of excessive treatment for the twelve (12) year old S.J., which was billed without any variation or revision for more than nine (9) months.   Happy Life continued to exaggerate the severity of S.J.'s pain and injuries throughout her purported treatment, including reporting that she experienced pain of 7/10 on January 27, 2020 and could not turn her head without pain at her final re-examination on February 5, 2020.  These reports suggest that S.J.'s condition somehow got worse despite the more than nine (9) months of physical therapy billed by Happy Life.

d.      Patient B.M. (Claim No. 0595270018) was allegedly involved in a motor vehicle accident on August 5, 2020.  B.M. immediately reported to Beaumont Health, where she reported only slight pain in her neck and right rib.  B.M.'s examination confirmed she experienced no pain or range of motion restrictions throughout her back, shoulders, and musculoskeletal region.  When B.M. was later referred to Faith PT, it was alleged that she had numerous additional injuries as well as dramatically increased injury severity.  Faith PT reported that B.M. had pain of 7-8/10 in her neck, both shoulders, low back, right hip, and left knee, as well as debilitating muscle strength of 3+/5 in her cervical spine, lumbar spine, and upper and lower extremities.  Faith PT further alleged B.M. experienced 40% range of motion restrictions in her cervical and lumbar spine, 30% range of motion restrictions in her extremities, and 20% range of motion restrictions in her upper extremities.   Based on this exaggerated initial examination, Faith PT billed for at least forty-forty (44) separate appointments over nearly four (4) months.  Faith PT further

73

alleged that B.M.'s pain remained at a nearly identical 6/10 on her final January 15, 2021 date of service, yet an outside facility performed an evaluation less than one (1) month earlier on December 23, 2020 that confirmed B.M.'s pain was only 3/10.

e.  Patient M.C. (Claim No. 0429088362) was allegedly involved in a motor vehicle accident on September 16, 2016. M.C. was evaluated at William Beaumont Hospital and determined to exhibit 5/5 muscle strength in all areas, no thoracic or lumbar tenderness, and normal cervical range of motion. M.C. was later referred to Core PT's prior iteration, Sterling PT, where he was purportedly examined by Payal Bhagat and alleged to have far more extreme limitations of 3+/5 in his cervical spine and 3-/5 in his lumbar spine. Sterling PT also claimed M.C. suffered diminished range of motion throughout his spine and "aching, throbbing, sharp" pain of 7-8/10. After two (2) months, M.C. was then transitioned to Core PT where he was again allegedly examined by Payal Bhagat and alleged to exhibit an identical pain score of 7/10 with no range of motion or muscle strength improvements. Despite noting no improvement in M.C.'s condition, Core PT billed for a highly similar course of treatment as Sterling PT. M.C. was then inexplicably transitioned to New Age PT on January 25, 2017. New Age PT then billed for nearly seven (7) months of purported treatment using same predetermined course of treatment modalities previously billed by Sterling PT and Core PT. After allegedly receiving more than nine (9) months of physical therapy at three (3) separate clinics related to the defendants, New Age PT's final assessment of M.C. on July 19, 2017 reported that M.C.'s pain had hardly improved at all to only a 6/10.

f.  Patients A.A. and A.P. (Claim No. 0572792554) were involved in an alleged motor vehicle accident on December 23, 2019. Neither A.A. nor A.P. reported injuries to the police or pursued any treatment immediately following the alleged accident. Eleven (11) days later, on January 3, 2020, both A.A. and A.P. allegedly reported to a physical therapy facility that billed for treatment for more than eight (8) months until at least August 31, 2020. Both A.A. and A.P. were evaluated at a pain management facility on July 8, 2020 where they were each found to exhibit

5/5 muscle strength in all areas and no spinal range of motion limitations. Both A.A. and A.P. also reported pain of only 5/10 on their final August 31, 2020 appointments at this unrelated physical therapy clinic. Both patients then stopped physical therapy for more than four (4) months before allegedly resuming treatment at Mirna PT on January 6, 2021. Mirna PT exaggerated both patients' purported physical restrictions, as each patient was alleged to exhibit severe 3+/5 spinal muscle strength limitations, range of motion restrictions in all areas of the spine, and pain scores higher than the patients previously reported on their final appointment at their prior physical therapy clinic. Based on these exaggerated findings, Mirna PT billed for numerous purported physical therapy modalities, including a number of services that were entirely redundant to A.A.'s and A.P.'s extensive prior treatment.

g. Patients Y.S. and N.S. (Claim No. 0486527930) were allegedly involved in a motor vehicle accident as passengers on December 4, 2017, at which time N.S. was only fifteen (15) years old and Y.S. was sixteen (16) years old. Neither N.S. nor Y.S. sought any sort of medical treatment immediately following the alleged accident and the police report confirmed that neither child sustained injuries. Several weeks later, on December 27, 2017, Siddique, without performing an evaluation, prescribed both minor patients physical therapy at Healing Service PT. Healing Service PT's purported initial examinations for both patients alleged nearly identical exaggerated limitations, including claiming each patient exhibited the same severe muscle strength limitations of (3/3+)/5, 20% cervical range of motion restrictions, and 8/10 "sharp, shooting" pain. Healing Service PT's clear use of template records and form language designed to create the appearance of more severe injuries is further confirmed by the fact that the purported "Objective" examination portion of both N.S.'s and Y.S.'s initial examination records are identical. Each patient's "Objective" evaluation record states verbatim "grimacing during transfer activity and ADLS due to pain in shoulder and neck." Based on these exaggerated examinations, Healing Service prescribed each patient its standard course of predetermined physical therapy modalities.

346.   The defendant clinics used these magnified and fabricated reports of injuries to falsely justify their excessive courses of treatment.

## 2.   **Identical and Excessive Treatment Plans**

347.   After developing the appearance of necessity for treatment through fabricated examination findings, the defendants ordered highly similar courses of therapy for every patient so that they could bill Allstate for extensive unnecessary treatment over the course of many months pursuant to a predetermined protocol.

348.   Healing Service PT billed for application of hot/cold packs and therapeutic exercises for 100%, electrical stimulation and therapeutic activities for more than 94%, and manual therapy for more than 74% of the patients at issue herein.  *See* Exhibit 1.

349.   Happy Life billed for therapeutic exercises, application of hot/cold packs, electrical stimulation, and ultrasound treatment for 100%, therapeutic activities for more than 96%, and manual therapy for more than 84% of the patients at issue herein.  *See* Exhibit 2.

350.   New Age PT billed for therapeutic exercises and manual therapy for 100%, application of hot/cold packs and electrical stimulation for more than 94%, and ultrasound treatment and patient self-education management and training for more than 84% of the patients at issue herein.  *See* Exhibit 3.

351.   Faith PT billed for massage, application of hot/cold packs, and electrical stimulation for 100%, therapeutic exercises for more than 90%, and ultrasound treatment for more than 84% of the patients at issue herein.  *See* Exhibit 4.

352.   Core PT billed for application of hot/cold packs for 100%, therapeutic exercises for more than 96%, ultrasound treatment and electrical stimulation for more than 94%, therapeutic activities for more than 81%, and massage for more than 77% of the patients at issue herein.  *See* Exhibit 5.

353.   Mirna PT billed for application of hot/cold packs, electrical stimulation, ultrasound treatment, therapeutic exercises, and manual therapy for 100% of the patients at issue herein.  *See* Exhibit 6.

354.   Olympic PT billed for application of hot/cold packs, electrical stimulation, ultrasound treatment, therapeutic exercises, therapeutic activities, massage, and manual therapy for 100% of the patients at issue herein.  *See* Exhibit 7.

355.   Once the defendant clinics established patients on these extensive predetermined courses of treatment, they were rarely, if ever, re-evaluated by the purported referring physician to determine the efficacy of treatment.

356.   Moreover, the defendant clinics rarely altered or discontinued these predetermined courses of therapy, even in the face of clear evidence that the course

of treatment ordered was not working, because their predetermined protocols were designed to maximize charges submitted to Allstate.

357. Indeed, many of the defendant clinics' patients failed to improve at all, or in many cases got worse, despite purportedly undergoing treatment for many months or years.

358. Specific examples of patients for whom the defendants submitted bills that far exceed standards of care include the following:

    a.    Patient L.Y. (Claim No. 0352742894) was allegedly involved in a motor vehicle accident on December 23, 2014. L.Y. presented to Beaumont Hospital where she was examined and found to exhibit a normal neck range of motion, a normal musculoskeletal range of motion, and movement in all four extremities without difficulty. L.Y. then initiated physical therapy on January 3, 2015 consisting of application of hot/cold packs, electrical stimulation, massage, and therapeutic exercises, and continued for more than eight (8) months until September 4, 2015 when L.Y. was discharged because she no longer experienced any pain. More than nine (9) months after that, L.Y. inexplicably resumed physical therapy at a separate facility and her treatment again consisted of application of hot/cold packs, electrical stimulation, and therapeutic exercises. L.Y.'s physical therapy treatment at this second clinic extended for more than twenty (20) months from June 24, 2016 through March 17, 2018. L.Y. then purportedly presented to Core PT, her third physical therapy facility, on March 22, 2018. Despite L.Y.'s nearly three (3) years of previous physical therapy, Core PT did not alter its standard predetermined course of treatment and immediately placed L.Y. on the clinic's normal protocol of hot packs, electrical stimulation, massage, and therapeutic exercises. This is particularly egregious because L.Y. had already received these same treatment modalities from previous clinics, yet Core PT failed to evaluate or acknowledge the (lack of) efficacy of L.Y.'s identical prior treatment. Core PT billed Allstate for this

excessive and medically unnecessary treatment to L.Y. for at least 95 additional dates of treatment over the course of more than seven (7) months from March 22, 2018 to October 31, 2018.

b.      Patient S.J. (Claim No. 0541414769) was allegedly involved in a motor vehicle accident on April 10, 2019.  S.J. was evaluated that day and determined to exhibit a normal range of motion in his neck and musculoskeletal region and was diagnosed with only a minor rib contusion.  S.J. then reported to Happy Life approximately two (2) weeks later where he was allegedly "diagnosed" with numerous new and more severe injuries, including purported pain of 7/10 in his back, neck, and both legs. Happy Life used these exaggerated findings to bill for at least 150 separate appointments over nearly two (2) years until at least April 21, 2021.  During this incredibly lengthy alleged treatment period, Happy Life failed to alter S.J.'s course of treatment despite not documenting any improvement.  Happy Life billed for therapeutic exercises, electrical stimulation, ultrasound treatment, and application of hot/cold packs at more than 95% of S.J.'s alleged 150 appointments.  Manual therapy and therapeutic exercises were billed for 85% or more of these appointments. Despite billing Allstate more than $115,000 for excessive, predetermined, physical therapy treatment for S.J., Happy Life's most recent re-examination on April 7, 2021 claimed S.J. could not turn his neck without increased pain, which suggests S.J.'s condition somehow got worse during his extensive alleged treatment.

c.      Patient B.S. (Claim No. 0504047838), the relative of Happy Life's owner Nicholas Sesi, was allegedly involved in a motor vehicle accident on May 19, 2018.  B.S. did not report to the emergency department or seek any sort of treatment immediately following the purported motor vehicle accident.  Prior to being evaluated by a physician or receiving any physical therapy referral, B.S. was allegedly driven by a "family member" to Happy Life for an initial visit on June 11, 2018, her first alleged evaluation following the alleged motor vehicle accident.  Once B.S. was received at her brother's clinic, Happy Life billed for an outrageous 168 physical therapy appointments over more than one (1) year and eight (8) months of continuous treatment.

Happy Life failed to meaningfully alter its course of treatment over this extended period, and continued to bill for treatment until at least February 17, 2020 despite documenting limited, if any, actual improvement for B.S.  Indeed, an evaluation on October 30, 2019 reported that B.S.'s pain was 7/10, which was nearly identical to the 8/10 pain score she reported at her initial June 11, 2018 Happy Life visit more than sixteen (16) months earlier.

d.      Patient I.G. (Claim No. 0570491654) was allegedly involved in a motor vehicle accident on December 1, 2019.  I.G. was examined that day and determined to exhibit a normal cervical range of motion and no thoracic or lumbar tenderness.  Five (5) days later on December 6, 2019, I.G. purportedly presented to Happy Life where she was alleged to exhibit severely diminished muscle strength of 3-/5 in her right shoulder, cervical, and lumbar spine and pain of 6-7/10.  Based on this purported examination, Happy Life billed for its standard course of hot/cold packs, electrical stimulation, ultrasound treatment, therapeutic exercises, therapeutic activities, and manual therapy for nearly three (3) months.  On June 17, 2020, after not receiving physical therapy for nearly four (4) months, I.G. allegedly resumed physical therapy with defendant Healing Service PT.  Despite I.G.'s prior purported treatment, Healing Service PT documented nearly identical muscle strength limitations of 3-/5 cervical and 3/5 lumbar spinal strength.  Healing Service PT also alleged I.G. experienced identical pain of 6-7/10.  Based on this highly similar examination, Healing Service PT billed for forty-four (44) days of purported treatment using the identical six (6) treatment modalities billed by Happy Life.  I.G. then allegedly presented to her third defendant clinic, Faith PT, on September 10, 2020.  Faith PT's initial September 10, 2020 examination once again alleged I.G. exhibited 3/5 muscle strength in her cervical and lumbar spine and unchanged pain of 7/10.  Faith PT billed for more than seven (7) months of additional physical therapy for I.G. until at least April 19, 2021 using many of the same treatment modalities.  Faith PT documented I.G. experienced purported pain of 6/10 on April 19, 2021, which means that I.G.'s condition did not improve despite her extended purported treatment with three (3) separate defendants.

e.   Patient K.S. (Claim No. 0483133666) was allegedly involved in a motor vehicle accident on November 23, 2017.  K.S. was examined that day and it was reported that she experienced "no back pain, no chest pain, no neck pain, no pain when bearing weight" in addition to having normal range of motion.  Despite these normal exam findings by an unrelated provider, Core PT billed for at least 224 alleged appointments over a more than eighteen (18) month period.  Core PT failed to alter K.S.'s course of treatment over this extensive period despite no indications that her physical therapy was meaningfully improving her "injuries." Core PT's examination on September 23, 2019, more than one (1) year and three (3) months after treatment began, alleged that K.S. still exhibited a severely diminished 3+/5 muscle strength in all areas of her spine and pain of up to 5/10, which is only slightly lower than the (6/7)/10 pain score K.S. reported at her initial evaluation.

f.   Patient Y.Y. (Claim No. 0454966243) was allegedly involved in a motor vehicle accident on April 21, 2017.  On June 6, 2017, Y.Y. presented to New Age PT, where he reported minimal pain of only 4/10.  Y.Y. was immediately placed on the clinic's excessive predetermined protocol of hot packs, electrical stimulation, neuromuscular reeducation, and therapeutic exercises.  Despite Y.Y.'s minor pain, New Age PT billed Allstate for this excessive and medically unnecessary treatment to Y.Y. for at least 167 different alleged dates of treatment over the course of fourteen (14) months from June 6, 2017 to August 6, 2018.

g.   Patient N.E. (Claim No. 0520103425) was allegedly involved in a motor vehicle accident on October 9, 2018.  N.E was evaluated that day and determined to exhibit full range of motion in his neck.  N.E. was then referred by Siddique, who did not perform his own examination, to Healing Service PT.  Healing Service PT billed for an initial examination on October 26, 2018, which contradicted N.E.'s prior examination and alleged that N.E. experienced limited cervical range of motion of 80%.  Based on this exaggerated examination, Healing Service PT placed N.E. on the clinic's excessive predetermined protocol of hot packs,

81

manual therapy, electrical stimulation, and therapeutic exercises. Healing Service PT billed Allstate for this excessive and medically unnecessary treatment to N.E. for at least 256 different alleged dates of treatment over the course of nearly twenty-three (23) months from October 26, 2018 to September 21, 2020. Despite billing Allstate more than $120,000 for at least 1,220 treatment modalities over a nearly twenty-three (23) month treatment period, Healing Service PT's final re-examination for N.E. on August 28, 2020 alleged that N.E.'s cervical range of motion had only improved by a minuscule 5% to 85%.

h.  Patients S.M., R.M., and R.M. (Claim No. Z5228294) were a father, mother, and daughter that were allegedly involved in the same motor vehicle accident on June 5, 2019. All three (3) patients were initially evaluated at AMC on June 10, 2019, where they were each immediately referred for same day examinations at Faith PT. Despite their differing ages and medical histories, Faith PT reported that each patient had nearly identical purported range of motion and muscle strength limitations and placed each patient on the clinic's excessive predetermined protocol of hot packs, massage, electrical stimulation, and therapeutic exercises. All three (3) patients, including R.M. who was only seventeen (17) at the time, were maintained on this standard treatment course for an identical period of more than eight (8) months from June 10, 2019 through February 18, 2020. By continuing each patient on its predetermined treatment plan designed to maximize billing without regard for patients' individualized needs, Faith PT generated more than $228,000 in charges relative to S.M., R.M., and R.M.

i.  Patient E.D. (Claim No. 0477011886) was allegedly involved in a motor vehicle accident on October 1, 2017. E.D. did not immediately report to a hospital, but instead reported to a pain management facility two (2) days later on October 3, 2017 where he was determined to exhibit full neck range of motion, full extremities range of motion, and spinal pain of 6-7/10. E.D. first began physical therapy at a separate clinic on November 17, 2017, where he remained for more than one (1) month before switching to Faith PT without any explanation. Faith PT's purported initial evaluation on December 27, 2017 alleged that

E.D.'s pain had actually increased to a 9/10. Faith PT billed for nearly five (5) months of alleged physical therapy for E.D. until May 15, 2018. E.D. then stopped pursuing treatment for nearly one (1) year before inexplicably reporting to Happy Life on May 10, 2019. Happy Life's purported May 10, 2019 initial examination made no mention of E.D.'s prior physical therapy at multiple clinics and did not explain the yearlong treatment gap. Happy Life then billed for nearly six (6) months of additional alleged physical therapy for E.D. On E.D.'s second to last alleged date of service on November 4, 2019, Happy Life alleged E.D.'s pain was an 8/10, which means that E.D.'s physical condition worsened after extended physical therapy with two (2) defendant clinics now more than two (2) years after his alleged motor vehicle accident.

### 3.  Billing for Unnecessary Services

359.  In addition to billing for excessive services based on exaggerated examination findings, many of the purported treatments billed by the defendants were entirely unnecessary and were not appropriate for patients' injuries or comorbidities.

360.  The defendants frequently billed for neuromuscular reeducation together with other standard timed therapy modalities such as therapeutic exercises, therapeutic activities, and manual therapy.

361.  Neuromuscular reeducation is a treatment to improve balance and coordination of the lower extremities, typically used when there are central nervous system dysfunctions after a stroke.

362.  Neuromuscular reeducation is not appropriate for patients with relatively minor orthopedic injuries, particularly upper extremity injuries.

363.   However, the defendants routinely billed for purported neuromuscular reeducation for patients without any lower extremity injuries or limitations to unnecessarily increase total treatment costs.

364.   For example, New Age PT billed for purported neuromuscular reeducation for more than 52% of the patients for which it submitted bills to Allstate despite the vast majority of these patients lacking any balance or coordination issues that could reasonably justify prescribing neuromuscular reeducation.

365.   Patient A.B. (Claim No. 0449847002) was allegedly involved in a motor vehicle accident on March 18, 2017 and reported to New Age PT on May 30, 2017 where her physical therapy diagnosis confirmed no pain or injuries to her lower body.

366.   New Age PT's assessment even confirmed: "patient is 3 months pregnant.  Patient's OBGYN has advised against any resistance exercise for lower limbs and trunk."

367.   Despite expressly documenting A.B. should not perform any lower body extremity exercises because of her pregnancy, New Age PT billed for purported neuromuscular reeducation on each of A.B.'s alleged dates of service.

368.   Patient M.S. (Claim No. 0481068872) was allegedly involved in a motor vehicle accident on November 6, 2017.

369.   That same day, M.S. immediately reported to an emergency department where she complained of only left neck and left shoulder soreness and explicitly denied any lower extremity pain or injury.

370.   Only two (2) weeks later on November 20, 2017, M.S. first allegedly presented to Happy Life, which immediately billed for alleged neuromuscular reeducation despite not documenting any lower extremity injuries or balance or coordination limitations for M.S.

371.   Because neuromuscular reeducation generated higher charges for the defendants, the defendants also mischaracterized charges for exercises that did not focus on balance and coordination of the lower extremities as purported "neuromuscular reeducation."

372.   Patient E.E. (Claim No. 0534762224) was allegedly involved in a motor vehicle accident on February 13, 2019 and presented to a hospital the same day, where she denied any difficulty walking and was found to exhibit normal coordination without any lower body pain, injuries, or limitations.

373.   Healing Service PT, without diagnosing any lower body injury, billed for purported neuromuscular reeducation for E.E. on twenty-five (25) separate dates of service.

374.   Further, Healing Service PT's neuromuscular reeducation charges were based on purported "posture education and training" exercises, which were not focused on improving balance or coordination for E.E.'s lower extremities.

375.   Patient R.S. (Claim No. 0510241649) was allegedly involved in a motor vehicle accident on July 8, 2018.

376.   R.S. allegedly presented to Faith PT on July 24, 2018, where she reported to exhibit a steady gait, normal ambulation, and independent mobility without pain or limitation.

377.   R.S. was prescribed Faith PT's standard course of therapeutic exercises, application of hot/cold packs, massage, and ultrasound treatment, but was not prescribed any neuromuscular reeducation.

378.   On October 26, 2018, Faith PT billed for purported neuromuscular reeducation for R.S. for the exact same exercises allegedly performed the previous day, a date that no neuromuscular reeducation was billed.

379.   The defendants also billed for physical therapy modalities that were redundant with treatment and services billed by other providers.

380.   For example, patient Q.Y. (Claim No. 0563618131) was allegedly involved in a motor vehicle accident on October 4, 2019.

381.   Four (4) days later on October 8, 2019, Q.Y. was evaluated by a physician and was prescribed an electrostimulation unit for home use.

382.   The next day, October 9, 2019, Q.Y. allegedly presented to Mirna PT for an initial visit.

383.   Despite Q.Y. being prescribed a home electrical stimulation device the previous day, Mirna PT billed for redundant electrical stimulation for each of Q.Y.'s forty-four (44) dates of service.

384.   Treatment that was performed, if at all, to generate additional bills for the defendants without any actual patient benefit is improper and medically unnecessary.

385.   Allstate is not required to pay the defendants for physical therapy treatment that was not medically necessary and is entitled to reimbursement for payments induced by the defendants' misrepresentations.

## IX.   FRAUDULENT BILLING PRACTICES

386.   Providers like the defendants have a responsibility to select and submit the billing code that accurately and truthfully identifies the services performed and the complexity involved in rendering those services.

387.   The defendants failed to meet this responsibility and instead submitted bills for unreasonable payments to Allstate for medically unnecessary and excessive services and used fraudulent billing practices, as discussed *infra*.

388.   All of the medical records, bills, and invoices submitted to Allstate by, and on behalf of, the defendants contained CPT Codes, which are published by the AMA.

389.   The bills submitted to Allstate by the defendants were submitted on Health Insurance Claim Forms (HICF) approved by the National Uniform Claim Committee (NUCC) and referenced in the NUCC Instruction Manual.

390.   The back of all HICF forms contains the following language in bold font: "NOTICE: Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties."

391.   Despite the warning on the back of the HICF forms, the defendants included false, incomplete, and misleading information in the bills and medical records submitted to Allstate through interstate wires and the U.S. Mail.

A.   **FRAUDULENT UNBUNDLING**

392.   The Centers for Medicare and Medicaid Services ("CMS") instituted the National Correct Coding Initiative ("NCCI") to promote national correct coding methodologies and to control improper coding leading to inappropriate payment for Medicare Part B claims.

393.   The NCCI contains an edit table entitled the "Column One/Column Two Correct Coding Edit Table" that identifies billing codes that should not be

reported together because the services (and payment) of the Column Two code is subsumed by the services (and payment) for the Column One code.

394.   Violation of the edits (billing a Column One code and a Column Two code on the same day for the same claimant) is known as "unbundling," which occurs when a provider bills separately for individual components of a procedure that are included in another billing code also billed for the same date of service.

395.   If a provider reports the two codes of an edit pair, the Column Two code is denied and the Column One code is eligible for payment.

396.   The defendant clinics routinely unbundled services billed to Allstate, which resulted in tens of thousands of dollars in fraudulent bills.

397.   Core PT, Happy Life, New Age PT, Healing Service PT, Faith PT, and Mirna PT each routinely submitted charges to Allstate using CPT Code 97124 ("*massage, including effleurage, petrissage and/or tapotement (stroking, compression, percussion)*") and CPT Code 97140 ("*manual therapy techniques (eg, mobilization/manipulation, manual lymphatic drainage, manual traction), 1 or more regions, each 15 minutes*") for the same patient on the same date of service.  *See* Exhibits 1 through 6.

398.   CPT code 97124 is a Column Two code and CPT code 97140 is a Column One code when billed for the same patient on the same date of service.

89

399. The submission of these codes for the same patient on the same date of service constitutes fraudulent unbundling.

400. Core PT, Happy Life, New Age PT, Healing Service PT, Faith PT, and Mirna PT submitted claims totaling more than $53,280 for purported massage using CPT code 97124 on the same dates of service they billed for purported manual therapy using CPT code 97140, all of which constitutes fraudulent unbundling. Id.

401. All claims submitted to Allstate for massage and manual therapy on the same date of service were fraudulently unbundled.

**B.    FRAUDULENT UPCODING**

402. Physical therapy examinations of patients are billed using CPT codes that reflect the complexity involved in the examination and it is the responsibility of the provider to select the appropriate CPT code for the complexity involved in the examination.

403. As discussed above, the defendants made misrepresentations to Allstate by submitting documentation that included CPT Codes for physical therapy services that (1) were not actually performed, (2) were not performed consistent with established standards of care, and (3) were wholly unwarranted and unnecessary.

404. The billing codes submitted to Allstate by the defendants also consistently exaggerated the complexity of evaluations in order to inflate the charges submitted to Allstate.

405.   There are three (3) levels at which a physical therapy examination can be billed: CPT code 97161 (*low complexity*), CPT code 97162 (*moderate complexity*), and CPT code 97163 (*high complexity*).

406.   The AMA guides that moderate complexity examinations should involve approximately 30 minutes of face-to-face time with the patient and moderate complexity clinical decision making resulting from an evolving clinical presentation with changing characteristics.

407.   The AMA guides that high complexity examinations should involve approximately 45 minutes of face-to-face time with the patient and high complexity clinical decision making resulting from a clinical presentation with unstable and unpredictable characteristics.

408.   New Age PT has billed Allstate for at least forty-nine (49) patient examinations since January 25, 2017 and has never billed for a single low complexity examination.  *See* Exhibit 3.

409.   More than 93% (41/44) of the total examinations billed by New Age PT were for alleged high complexity examinations.

410.   Core PT has billed Allstate for at least 54 patient examinations since January 3, 2017 and has never billed for a single low complexity examination.  *See* Exhibit 5.

411.   Since it began submitting bills to Allstate on January 22, 2020, Olympic PT has never billed for a low complexity examination.  *See* Exhibit 7.

412.   As discussed *supra*, the defendants routinely exaggerated purported diagnoses during patients' initial examinations in an attempt to present the appearance of more severe injuries.

413.   In reality, the vast majority of patients presenting to the defendant clinics exhibited, at most, minor soft-tissue injuries that certainly did not present "unstable or unpredictable" characteristics necessary to justify a high complexity evaluation or even "evolving and changing" characteristics to support a moderate complexity examination.

414.   For example, patient B.K. (Claim No. 0454414953) was allegedly involved in a motor vehicle accident on April 26, 2017.

415.   Five (5) days later on May 1, 2017, B.K. first allegedly reported to New Age PT where he complained of only general neck, shoulder, and back pain, yet New Age PT billed for a purported high complexity examination on May 1, 2017.

416.   About one (1) month on June 2, 2017, B.K. was again examined at New Age PT.

417.   Instead of billing for a re-examination of an established patient, New Age PT inexplicably billed for a second high complexity initial examination on June 2, 2017.

418. New Age PT's entire June 2, 2017 re-examination that was improperly billed as a high complexity **initial** examination resulted in a record only one (1) page in length that contained extremely limited subjective assessment and changes to treatment plan sections that do not approach the level of complexity required to bill for a complex initial patient evaluation.

419. New Age PT chose to improperly bill B.K.'s trivial re-examination as a purported high complexity initial examination because high complexity examinations can be billed at a much higher rate than re-evaluations of an established patient.

420. For numerous other patients, New Age PT submitted multiple bills for the same purported examination, first submitting an initial bill that upcoded the alleged evaluation as a high complexity examination, then, only if the first bill was not paid, submitting a second bill for the same evaluation instead charged as a moderate complexity examination.

421. This confirms New Age PT first attempted to bill all examinations as "high complexity" regardless of the patient's injuries or the examination's actual level of clinical decision-making, and only revised its bills to lower level examinations if these original, upcoded bills were not paid.

422. Similarly, Faith PT billed for an initial physical therapy evaluation for patient B.M. (Claim No. 0595270018) on September 22, 2020.

423.   Only seven (7) days later on September 29, 2020, Faith PT billed for a second initial examination for B.M., which was not medically necessary or appropriate (or possible).

424.   Core PT billed for a purported initial examination for patient A.M. (Claim No. 0506232628) on June 20, 2018.

425.   About one (1) month later on July 23, 2018, Core PT submitted a second charge for an initial examination that, if performed at all, should have been a re-examination charge billed at a lower rate.

426.   The defendants also attempted to increase their charges by improperly billing for multiple re-examinations within a very short period.

427.    Physical therapy re-examinations are billed using CPT code 97164, and, unlike initial examinations, re-examinations do not have separate codes to delineate different complexity levels.

428.   However, it is still only appropriate to bill for a physical therapy re-examination when the following occur:

(1)   Review patient history and use of standardized tests and measures.

(2)   Revise the patient's plan of care using a standardized patient assessment instrument and/or measurable assessment of functional outcome.

429.   The defendants routinely billed for re-examinations that failed to meet these specific requirements.

430.   For example, Happy Life billed for three (3) purported re-examinations for patient S.M. (Claim No. 0514275858) on October 15, 2018, October 22, 2018, and November 2, 2018, which is just an eighteen (18) day period.

431.   Not only was it entirely medically unnecessary to review S.M.'s history and revise S.M.'s plan of care three (3) times over just eighteen (18) days, the alleged October 22, 2018 re-examination did not include any standardized tests or revised patient plan of care.

432.   Healing Service PT billed for four (4) alleged re-examinations for patient S.S. (Claim No. 0475969977) on December 26, 2017, December 28, 2017, December 29, 2017, and January 3, 2018, just an eight (8) day period.

433.   On three (3) of the four (4) purported re-examinations dates, December 26, 2017, December 28, 2017, and December 29, 2017, no type of re-assessment, standardized tests, or patient history review were performed at all.

434.   Healing Service PT billed for purported re-examinations for patient E.E. (Claim No. 0534762224) on April 24, 2019 and again only seven (7) days later on May 1, 2019.

435.   E.E.'s May 1, 2019 re-examination was entirely unnecessary and simply repeated identical short term and long term goals copied directly from E.E.'s April 24, 2019 re-examination.

436.   New Age PT billed for purported re-examinations for patient L.A. (Claim No. 0545904954) on June 24, 2019 and again only seven (7) days later on July 1, 2019.

437.   Both Faith PT and New Age PT also submitted charges for purported examinations using CPT code 97001 and re-examinations using CPT code 97002 in 2017 and 2018.

438.   These two (2) CPT Codes were deleted from the CPT Code Book by the AMA effective January 1, 2017, and all of the charges by Faith PT and New Age PT for these purported codes in 2017 and 2018 were submitted after the code ceased to be valid.

439.   By creating medical bills that included CPT codes for physical therapy examinations and re-examinations and then causing such bills to be faxed and mailed to Allstate, the defendants represented to Allstate that the invoiced medical services had been performed in conformity with the AMA's CPT Code Guidelines.

440.   However, all of the bills prepared, faxed, and mailed by the defendants were submitted using fraudulent and deceptive examination CPT codes.

441.   As such, Allstate is not obligated to pay any pending examination bills and is entitled to restitution for those office visits for which it has already tendered payment.

## X.    <u>EXCESSIVE AND UNREASONABLE CHARGES</u>

442.   The defendants billed Allstate at rates that were unreasonable and had no relation to the services billed.

443.   Mirna PT routinely billed Allstate $100 per patient date of service using CPT Code 99702 for "additional supplies, materials, or clinical staff time."

444.   Despite charging $100 per patient per date of service using this medical supply code, Mirna PT's charges were for disposable masks, which can be purchased in large quantities at less than $0.10 per mask.

445.   Relative to only three (3) patients in 2021 alone, Mirna PT billed $4,800 solely related to disposable masks, a 480 times markup considering a fifty (50) pack of masks costs only $10.00:



446.   Bills for alleged examinations submitted by the defendants were similarly excessive and facially illogical.

447.   Faith PT billed Allstate $300 for a purported **moderate** complexity examination using CPT Code 97161 for patient S.M. (Claim No. 0516026382), yet routinely increased its rate to $400 for less intensive, **low** complexity examinations for numerous patients.

448.   Happy Life billed Allstate $100 for an alleged re-examination of patient S.M. (Claim No. 0514275858) on October 15, 2018, yet doubled its charge to $200 for a second, identical and entirely redundant re-examination of S.M. billed only one (1) week later on October 22, 2018.

449.   Happy Life also routinely billed $225 for moderate complexity patient examinations, yet increased its charge to $330 for a purported low complexity examination for S.M. on September 7, 2018.

450.   Healing Service PT billed Allstate $225 for a purported high complexity examination of patient Y.Y. (Claim No. 0454966243) on June 6, 2017, yet inexplicably increased its charge to $300 each time it billed Allstate for less intensive, moderate examinations.

451.   In addition to being significantly excessive, the defendants' charges for purported physical therapy modalities fluctuated greatly for no apparent reason.

452.   For example, Mirna PT billed Allstate $360 for two (2) units of therapeutic exercises for patient A.P. (Claim No. 0572792554) on January 29, 2021.

453.   Only two (2) days later on February 1, 2021, Mirna PT billed for identical purported treatment, two (2) units of therapeutic exercises, but charged an absurd $720.

454.   Healing Service PT submitted multiple bills for patient A.B. (Claim No. 0449847002) on June 26, 2017, one that charged a purported re-examination for $150 and a second that billed this same examination for $200.

455.   Healing Service PT unilaterally increasing its charge for the same procedure on a later bill confirms that the prices it billed Allstate were arbitrary and not related to the specific treatment and services billed.

456.   In addition to these specific examples of improperly increased charges, the defendants' pervasive billing for services not rendered and fraudulent billing resulted in them billing Allstate for hundreds of thousands of dollars in unsupported and improper charges.

457.   For example, all of the defendants billed for purported one-on-one, constant attendance exercises for each patient on each date of service, often charging multiple units.

458.   As discussed at length *supra*, the only services actually performed, if at all, was group therapy with a single therapist monitoring multiple patients.

459.  Thus, the defendants' fraudulently increased treatment costs by uniformly billing for purported one-on-one exercises at increased rates instead of billing for group exercises.

460.  Allstate is not required to pay the defendants for treatment and services fraudulently billed pursuant to a predetermined treatment protocol, or charged for more than reasonable and customary rates, and is entitled to the return of all sums paid due to the defendants' baseless and unreasonable charges.

## XI.  MISREPRESENTATIONS MADE BY THE DEFENDANTS AND RELIED ON BY ALLSTATE

### A.  MISREPRESENTATIONS BY THE DEFENDANTS

461.  To induce Allstate to pay promptly their fraudulent charges, the defendants submitted and caused to be submitted to Allstate false documentation that materially misrepresented that the services they billed for were necessary within the meaning of the Michigan No-Fault Act, that the charges for the same were reasonable, and that all treatment was lawfully and actually rendered.

462.  Claims for medical benefits under Michigan's No-Fault Act can only be made for "reasonable charges incurred for reasonably necessary products, services and accommodations for an injured person's care, recovery, or rehabilitation."  Mich. Comp. Laws § 500.3107(1)(a).

463.    Moreover, claims for medical benefits under Michigan's No-Fault Act can only be made for services that are "lawfully render[ed]."  Mich. Comp. Laws § 500.3157(1).

464.    Thus, every time the defendants submitted bills and medical records to Allstate supporting their claims for No-Fault benefits, the defendants necessarily warranted that such bills and records related to lawfully and actually rendered and necessary treatment for their patients' care, recovery, or rehabilitation.

465.    There are no less than ten (10) separate reasons why the defendants' alleged treatment was not in fact performed, was not lawful, was not medically necessary, and was fraudulently billed to Allstate:

a.      Healing Service PT, Happy Life, New Age PT, Faith PT, Core PT, Mirna PT, Olympic PT, Mirna Kakos, Thaer Kakos, Al Soudani, Elia, Fakhouri, Hemana, Sesi, Karrumi, and Siddique billed Allstate for appointments and for specific physical therapy treatment modalities that were not performed.

b.      Healing Service PT, Happy Life, New Age PT, Faith PT, Core PT, Mirna PT, Olympic PT, Mirna Kakos, Thaer Kakos, Al Soudani, Elia, Fakhouri, Hemana, Sesi, Karrumi, and Siddique billed Allstate for physical therapy treatment that required one-on-one skilled intervention and constant attendance from a qualified healthcare professional that was not actually provided.  Patients at issue in this Complaint consistently reported no one-on-one treatment or supervision by the defendants.

c.      Healing Service PT, Happy Life, New Age PT, Faith PT, Core PT, Mirna PT, Olympic PT, Mirna Kakos, Thaer Kakos, Al Soudani, Elia, Fakhouri, Hemana, Sesi, Karrumi, and Siddique billed Allstate for extensive timed physical therapy treatment modalities that were not actually provided for the time billed.  Patients at issue in this Complaint

have confirmed that timed treatments charged by these defendants did not occur as billed.

d.     Healing Service PT, Happy Life, New Age PT, Faith PT, Core PT, Mirna PT, Olympic PT, Mirna Kakos, Thaer Kakos, Al Soudani, Elia, Fakhouri, Hemana, Sesi, Karrumi, and Siddique made kickback payments and other improper inducements to lure patients to the defendants for medically unnecessary treatments that the patients did not need, did not seek out on their own, and would not have undergone but for the improper inducements.

e.     Healing Service PT, Happy Life, New Age PT, Faith PT, Core PT, Mirna PT, Olympic PT, Mirna Kakos, Thaer Kakos, Al Soudani, Elia, Fakhouri, Hemana, Sesi, Karrumi, and Siddique illegally solicited patients for unnecessary treatment and engaged in *quid pro quo* relationships with each other.  The defendants utilized and employed runners to identify and recruit individuals who claimed to be in motor vehicle accidents and intentionally sought out patients who did not require medical care and would not have presented for the same but for the unlawful solicitation.   The defendants' methods of obtaining patients did not include considerations of medical necessity and allowed individuals with no medical training to control patients' treatment.

f.     Healing Service PT, Happy Life, New Age PT, Faith PT, Core PT, Mirna PT, Olympic PT, Mirna Kakos, Thaer Kakos, Al Soudani, Elia, Fakhouri, Hemana, Sesi, Karrumi, and Siddique adhered to a predetermined protocol of treatment that led to billing for unnecessary, indiscriminate, and excessive physical therapy treatment modalities that were medically unnecessary and had no relationship to patient-specific considerations.

g.     Happy Life and Faith PT submitted bills to Allstate for unlawful and unlicensed treatment and services, including for unlicensed issuance of DME.  Allstate is not required to pay the defendants for unlawful treatment that violated Michigan laws and regulations.

h.     Healing Service PT, Happy Life, New Age PT, Faith PT, Core PT, Olympic PT, Mirna Kakos, Thaer Kakos, Al Soudani, Elia, Fakhouri, Hemana, Sesi, Karrumi, and Siddique fraudulently upcoded office

visits, as the vast majority of the office visits billed to Allstate did not meet the criteria set by the AMA to bill at such high levels. When done intentionally, as the defendants did, upcoding constitutes a fraudulent billing practice.

i.    Healing Service PT, Happy Life, New Age PT, Faith PT, Core PT, Mirna PT, Mirna Kakos, Thaer Kakos, Al Soudani, Elia, Fakhouri, Hemana, Sesi, Karrumi, and Siddique submitted claims using multiple CPT codes to describe the same procedure allegedly performed, which is a fraudulent billing practice known as unbundling.

j.    Healing Service PT, Happy Life, Mirna PT, Mirna Kakos, Thaer Kakos, Hemana, Sesi, Karrumi, and Siddique submitted charges to Allstate at amounts that were excessive and unreasonable for nearly all services at issue herein.

466. As detailed *supra*, the defendants frequently violated established standards of care, treated unnecessarily and excessively, and rendered treatment without basis or adequate substantiation.

467. If treatment is not required for a patient's care, recovery, or rehabilitation, such treatment is not medically necessary.

468. The foregoing facts – billing for services not rendered, unlawfully soliciting patients, paying kickbacks, using a predetermined treatment protocol to exaggerate injuries and inflate charges, and misrepresenting the necessity of treatment – were not, and could not have been, known to Allstate until it commenced its investigation of the defendants shortly before the filing of this action.

469.   Taken as a whole, the prevalence of such facts and the defendants' failure to abide by accepted standards of care render the treatment allegedly provided by the defendants unnecessary and unlawful.

470.   The fact of unnecessary treatment is present with respect to every patient at issue in this Complaint, including those specific patient examples set out above and in the charts annexed at Exhibits 1 through 7.

471.   Thus, each claim for payment (and accompanying medical records) under Michigan's No-Fault Act faxed and mailed to Allstate by, on behalf of, or with the knowledge of the defendants constitutes a misrepresentation because the treatment underlying the claim was not lawful and medically necessary, as it must be in order to be compensable under Michigan law.

472.   Moreover, each HICF submitted to Allstate by the defendants contained the following notation: "NOTICE: Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties."

473.   Through the submission of patient records, invoices, HICFs, and other medical documentation to Allstate via the interstate wires and the U.S. Mail, the defendants attested to the fact, lawfulness, and medical necessity of the physical

therapy visits, examinations, procedures, and ancillary services for which they billed Allstate.

474. As the defendants did not render lawful and reasonably necessary medical treatment and services, and misrepresented the treatment and services purportedly performed, each bill and accompanying documentation faxed or mailed by or on behalf of the defendants to Allstate constitutes a material misrepresentation.

## B. ALLSTATE'S JUSTIFIABLE RELIANCE

475. The facially valid documents submitted to Allstate by the defendants were designed to, and did in fact, induce Allstate to rely on the documents.

476. At all relevant times, the defendants concealed from Allstate facts regarding the fact, lawfulness, and medical necessity of services billed by them to prevent Allstate from discovering that the claims submitted by and on behalf of the defendants were not compensable under the No-Fault Act.

477. These misrepresentations include submitting false medical documentation, including HICFs, regarding the fact, lawfulness, and necessity of medical treatment in order to seek payment under Michigan's No-Fault Act.

478. Evidence of the fraudulent scheme detailed in this Complaint was not discovered until after patterns had emerged and Allstate began to investigate the defendants, revealing the true nature and full scope of their fraudulent scheme.

479.   Due to the defendants' material misrepresentations and other affirmative acts designed to conceal their fraudulent scheme, Allstate did not and could not have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

480.   In reliance on the defendants' misrepresentations, Allstate paid money to the defendants to its detriment.

481.   Allstate would not have paid these monies had the defendants provided true and accurate information about the fact, lawfulness, and necessity of the referrals and medical services billed.

482.   As a result, Allstate has paid in excess of $2,775,094 to the defendants in reasonable reliance on the false medical documentation and false representations regarding the defendants' eligibility for payment under the Michigan No-Fault Act.

## XII.   MAIL AND WIRE FRAUD RACKETEERING ACTIVITY

483.   As discussed above, the referrals, treatment, and services billed by the defendants were not medically necessary, were unlawful, and were fraudulently billed.

484.   The objective of the scheme to defraud Allstate, which occurred throughout the period noted in Exhibits 1 through 7, was to collect No-Fault benefits to which the defendants were not entitled because the medical services rendered, if at all, were a product of unlawful solicitation, unlawful kickbacks, were not

necessary and were not lawfully rendered, were fraudulently billed, and were billed at excessive and unreasonable amounts.

485. This objective necessarily required the submission of claims for payment to Allstate.

486. The defendants created, prepared, and submitted false medical documentation and placed in a post office and/or authorized depository for mail matter things to be sent and delivered by the United States Postal Service or sent through faxes over interstate wires.

487. All documents, medical records, notes, reports, HICFs, bills, medical diagnoses, letters, correspondence, and requests for payment in connection with the insurance claims referenced throughout this pleading traveled through interstate wires or the U.S. Mail.

488. All medical records and bills submitted through interstate wires by the defendants were faxed from the defendants in Michigan to Allstate in Iowa.

489. Allstate received all medical records and bills faxed to it by the defendants in Iowa.

490. Every automobile insurance claim detailed herein involved at least one (1) use of the U.S. Mail, including the mailing of, among other things, the notice of claim and insurance payments.

491. It was foreseeable to the defendants that faxing bills and medical records to Allstate would trigger mailings in furtherance of the scheme to defraud, including actual payment of fraudulent bills via checks mailed by Allstate.

492. Every payment at issue in this Complaint where Allstate was induced to rely on the defendants' false medical records and bills was tendered via a check mailed by Allstate using the U.S. Mail.

493. The fraudulent medical billing scheme detailed herein generated thousands of mailings and faxes.

494. A chart highlighting representative examples of mail and wire fraud arising from the defendants' patient/business files is annexed hereto at Exhibit 8.

495. As detailed herein, the defendants also submitted, caused to be submitted, or knew medical documentation and claims for payment would be submitted to Allstate via fax or mail related to each exemplar patient discussed in this Complaint.

496. It was within the ordinary course of business for Healing Service PT, Happy Life, New Age PT, Faith PT, Core PT, Mirna PT, and Olympic PT to submit claims for No-Fault payment to insurance carriers like Allstate through interstate wires and the U.S. Mail.

497. Moreover, the business of billing for medical services by each of the defendant clinics at issue herein is regularly conducted by fraudulently seeking

payment to which each defendant clinic is not entitled through the use of fraudulent communications sent via intestate wires and the U.S. Mail.

498.   In other words, discrete (claim- and patient-specific) instances of mail and wire fraud are a regular way of doing business for each of the defendants.

499.   The defendant clinics, at the direction and with the knowledge of their defendant owners and managers (including the individual defendants), continue to submit claims for payment to Allstate and, in some instances, continue to commence litigation against Allstate seeking to collect on unpaid claims.

500.   Thus, the defendants' commission of mail and wire fraud continues.

501.   As all of the defendants named herein agreed that they would use (and, in fact, did use) the mails in furtherance of their scheme to defraud Allstate by seeking payment for services that are not compensable under the Michigan No-Fault Act, these defendants committed mail fraud, as defined in 18 U.S.C. § 1341.

502.   As several of the defendants named herein agreed that they would use (and, in fact, did use) faxes over interstate wires in furtherance of their scheme to defraud Allstate by seeking payment for services that are not compensable under the Michigan No-Fault Act, these defendants committed wire fraud, as defined in 18 U.S.C. § 1343.

503.   Allstate reasonably relied on the submissions it received from Healing Service PT, Happy Life, New Age PT, Faith PT, Core PT, Mirna PT, and Olympic

PT including the representative submissions set out in Exhibits 1 through 8 annexed hereto and identified in the exemplar patients above.

504.   As the defendants agreed to pursue the same criminal objective (namely, mail and wire fraud), they committed a conspiracy within the meaning of the RICO Act, 18 U.S.C. § 1962(d), and are therefore jointly and severally liable for Allstate's damages.

## XIII. <u>DAMAGES</u>

505.   The pattern of fraudulent conduct by the defendants injured Allstate in its business and property by reason of the aforesaid violations of law.

506.   Although it is not necessary for Allstate to calculate damages with specificity at this stage in the litigation, and Allstate's damages continue to accrue, Allstate's injury includes, but is not limited to, compensatory damages in excess of $2,775,094.

507.   Exhibits 9 (Healing Service), 10 (Happy Life), 11 (New Age PT), 12 (Faith PT), 13 (Core PT), 14 (Mirna PT), and 15 (Olympic PT), annexed hereto and incorporated herein as if set forth in their entirety, identify monies paid by Allstate to the defendants by date, payor, patient claim number, check number, and amount.

508.   Allstate's claim for compensatory damages, as set out in Exhibits 9 through 15, does not include payment made with respect to any Assigned Claim Facility/Michigan Automobile Insurance Placement Facility claimant.

509.   Every payment identified in Exhibits 9 through 15 was made by Allstate alone.

510.   Moreover, every payment identified in Exhibits 9 through 15 derives from a check sent by Allstate to the defendants through the U.S. Mail.

511.   As such, the defendants knew that the U.S. Mail would be used as part of their scheme to defraud as the defendants only faxed and mailed medical records and bills for the purpose of having Allstate rely on such documents and mail payment in response thereto.

512.   Allstate also seeks damages, in an amount to be determined at trial, related to the cost of claims handling/adjustment for claims mailed and faxed by the defendants, which includes the cost of investigation to uncover the fraudulent nature of the claims submitted by the defendants.

513.   Allstate investigated each of the defendants both individually and in connection with the comprehensive scheme detailed herein and incurred investigative and claims handling expenses with respect to each defendant.

## XIV.  <u>CAUSES OF ACTION</u>

**<u>COUNT I</u>**
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(Healing Service PT Enterprise)**
**Against Nick Hemana and Naveed Siddique, M.D.**

514.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 513 set forth above as if fully set forth herein.

515.   Healing Service PT constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

516.   In connection with the claims identified in the within Complaint, Hemana and Siddique ("Count I defendants") intentionally caused to be prepared, faxed, and mailed false medical documentation by Healing Service PT, or knew that such false medical documentation would be faxed and mailed in the ordinary course of Healing Service PT's business, or should have reasonably foreseen that the mailing of such false medical documentation by Healing Service PT would occur, in furtherance of the Count I defendants' scheme to defraud.

517.   The Count I defendants knew that two (2) or more faxes and mailings would be sent to demand and receive payment from Allstate on certain dates, including, but not limited to, those mailings identified in the chart annexed hereto at Exhibit 8.

518.   As documented above, the Count I defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by Healing Service PT, which they knew would be billed by Healing Service PT, in order to collect payment from Allstate under applicable provisions of the Michigan No-Fault Act.

519.   Hemana owned and managed Healing Service PT and was responsible for all actions taken by Healing Service PT and its staff.

520.   Siddique wrote medically unnecessary physical therapy prescriptions and made predetermined referrals that falsely created the appearance of injury and allowed Healing Service PT to bill Allstate.

521.   The Count I defendants submitted, and caused to be submitted, false and fraudulent medical records, bills, and invoices that created the appearance of injury and permitted Healing Service PT to continue providing unlawful and medically unnecessary treatment, if provided at all.

522.   As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued payment drafts to Healing Service PT for the benefit of the Count I defendants that would not otherwise have been paid.

523.   The Count I defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

524.   By virtue of the Count I defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT II**
**VIOLATION OF 18 U.S.C. § 1962(d)**
**(Healing Service PT Enterprise)**
**Against Nick Hemana and Naveed Siddique, M.D.**

525.    Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 513 set forth above as if fully set forth herein.

526.    Defendants Hemana and Siddique ("Count II defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Healing Service PT.

527.    The Count II defendants each agreed to further, facilitate, support, and operate the Healing Service PT enterprise.

528.    As such, the Count II defendants conspired to violate 18 U.S.C. § 1962(c).

529.    The purpose of the conspiracy was to obtain insurance payments from Allstate on behalf of Healing Service PT even though Healing Service PT was not eligible to collect such payments by virtue of its unlawful conduct.

530.    The Count II defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

531.   Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make insurance payments as a result of the Count II defendants' unlawful conduct described herein.

532.   By virtue of this violation of 18 U.S.C. § 1962(d), the Count II defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count II defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT III**
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(Happy Life Enterprise)**
**Against Nicholas Sesi and Natham Karrumi, D.C.**

533.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 513 set forth above as if fully set forth herein.

534.   Happy Life constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

535.   In connection with the claims identified in the within Complaint, Sesi and Karrumi ("Count III defendants") intentionally caused to be prepared, faxed, and mailed false medical documentation by Happy Life, or knew that such false medical documentation would be faxed and mailed in the ordinary course of Happy Life's business, or should have reasonably foreseen that the mailing of such false

medical documentation by Happy Life would occur, in furtherance of the Count III defendants' scheme to defraud.

536.   The Count III defendants knew that two (2) or more faxes and mailings would be sent to demand and receive payment from Allstate on certain dates, including, but not limited to, those mailings identified in the chart annexed hereto at Exhibit 8.

537.   As documented above, the Count III defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by Happy Life, which they knew would be billed by Happy Life, in order to collect payment from Allstate under applicable provisions of the Michigan No-Fault Act.

538.   Sesi and Karrumi owned and managed Happy Life and were responsible for all actions taken by Happy Life and its staff.

539.   The Count III defendants submitted, and caused to be submitted, false and fraudulent medical records, bills, and invoices that created the appearance of injury and permitted Happy Life to continue providing unlawful and medically unnecessary treatment, if provided at all.

540.   As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued

payment drafts to Happy Life for the benefit of the Count III defendants that would not otherwise have been paid.

541.   The Count III defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

542.   By virtue of the Count III defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT IV
## VIOLATION OF 18 U.S.C. § 1962(d)
### (Happy Life Enterprise)
### Against Nicholas Sesi and Natham Karrumi, D.C.

543.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 513 set forth above as if fully set forth herein.

544.   Defendants Sesi and Karrumi ("Count IV defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Happy Life.

545.   The Count IV defendants each agreed to further, facilitate, support, and operate the Happy Life enterprise.

546.   As such, the Count IV defendants conspired to violate 18 U.S.C. § 1962(c).

547.   The purpose of the conspiracy was to obtain insurance payments from Allstate on behalf of Happy Life even though Happy Life was not eligible to collect such payments by virtue of its unlawful conduct.

548.   The Count IV defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

549.   Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make insurance payments as a result of the Count IV defendants' unlawful conduct described herein.

550.   By virtue of this violation of 18 U.S.C. § 1962(d), the Count IV defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count IV defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT V**
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(New Age PT Enterprise)**
**Against Lamya Fakhouri and Naveed Siddique, M.D.**

551.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 513 set forth above as if fully set forth herein.

552. New Age PT constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

553. In connection with the claims identified in the within Complaint, Fakhouri and Siddique ("Count V defendants") intentionally caused to be prepared, faxed, and mailed false medical documentation by New Age PT, or knew that such false medical documentation would be faxed and mailed in the ordinary course of New Age PT's business, or should have reasonably foreseen that the mailing of such false medical documentation by New Age PT would occur, in furtherance of the Count V defendants' scheme to defraud.

554. The Count V defendants knew that two (2) or more faxes and mailings would be sent to demand and receive payment from Allstate on certain dates, including, but not limited to, those mailings identified in the chart annexed hereto at Exhibit 8.

555. As documented above, the Count V defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by New Age PT, which they knew would be billed by New Age PT, in order to collect payment from Allstate under applicable provisions of the Michigan No-Fault Act.

556. Fakhouri owned and managed New Age PT and was responsible for all actions taken by New Age PT and its staff.

119

557.   Siddique wrote medically unnecessary physical therapy prescriptions and made predetermined referrals that falsely created the appearance of injury and allowed New Age PT to bill Allstate.

558.   The Count V defendants submitted, and caused to be submitted, false and fraudulent medical records, bills, and invoices that created the appearance of injury and permitted New Age PT to continue providing unlawful and medically unnecessary treatment, if provided at all.

559.   As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued payment drafts to New Age PT for the benefit of the Count V defendants that would not otherwise have been paid.

560.   The Count V defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

561.   By virtue of the Count V defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT VI
## VIOLATION OF 18 U.S.C. § 1962(d)
### (New Age PT Enterprise)
### Against Lamya Fakhouri and Naveed Siddique, M.D.

562.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 513 set forth above as if fully set forth herein.

563.   Defendants Fakhouri and Siddique ("Count VI defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of New Age PT.

564.   The Count VI defendants each agreed to further, facilitate, support, and operate the New Age PT enterprise.

565.   As such, the Count VI defendants conspired to violate 18 U.S.C. § 1962(c).

566.   The purpose of the conspiracy was to obtain insurance payments from Allstate on behalf of New Age PT even though New Age PT was not eligible to collect such payments by virtue of its unlawful conduct.

567.   The Count VI defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

568.   Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make insurance payments as a result of the Count VI defendants' unlawful conduct described herein.

569.   By virtue of this violation of 18 U.S.C. § 1962(d), the Count VI defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count VI defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT VII
## VIOLATION OF 18 U.S.C. § 1962(c)
### (Faith PT Enterprise)
### Against Louay Al Soudani and Mirna Kakos

570.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 513 set forth above as if fully set forth herein.

571.   Faith PT constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

572.   In connection with the claims identified in the within Complaint, Al Soudani and Mirna Kakos ("Count VII defendants") intentionally caused to be prepared, faxed, and mailed false medical documentation by Faith PT, or knew that such false medical documentation would be faxed and mailed in the ordinary course of Faith PT's business, or should have reasonably foreseen that the mailing of such

false medical documentation by Faith PT would occur, in furtherance of the Count VII defendants' scheme to defraud.

573.   The Count VII defendants knew that two (2) or more faxes and mailings would be sent to demand and receive payment from Allstate on certain dates, including, but not limited to, those mailings identified in the chart annexed hereto at Exhibit 8.

574.   As documented above, the Count VII defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by Faith PT, which they knew would be billed by Faith PT, in order to collect payment from Allstate under applicable provisions of the Michigan No-Fault Act.

575.   Al Soudani owned and managed Faith PT and was responsible for all actions taken by Faith PT and its staff.

576.   Mirna Kakos was responsible for the illegal solicitation and inducement of patients and improper referrals that resulted in unlawful and unnecessary treatment by Faith PT that was billed to Allstate.

577.   The Count VII defendants submitted, and caused to be submitted, false and fraudulent medical records, bills, and invoices that created the appearance of injury and permitted Faith PT to continue providing unlawful and medically unnecessary treatment, if provided at all.

578.   As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued payment drafts to Faith PT for the benefit of the Count VII defendants that would not otherwise have been paid.

579.   The Count VII defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

580.   By virtue of the Count VII defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT VIII
## VIOLATION OF 18 U.S.C. § 1962(d)
### (Faith PT Enterprise)
### Against Louay Al Soudani and Mirna Kakos

581.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 513 set forth above as if fully set forth herein.

582.   Defendants Al Soudani and Mirna Kakos ("Count VIII defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Faith PT.

583.   The Count VIII defendants each agreed to further, facilitate, support, and operate the Faith PT enterprise.

584.   As such, the Count VIII defendants conspired to violate 18 U.S.C. § 1962(c).

585.   The purpose of the conspiracy was to obtain insurance payments from Allstate on behalf of Faith PT even though Faith PT was not eligible to collect such payments by virtue of its unlawful conduct.

586.   The Count VIII defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

587.   Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make insurance payments as a result of the Count VIII defendants' unlawful conduct described herein.

588.   By virtue of this violation of 18 U.S.C. § 1962(d), the Count VIII defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count VIII defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT IX**
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(Core PT Enterprise)**
**Against Salwa Elia and Naveed Siddique, M.D.**

589.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 513 set forth above as if fully set forth herein.

590.   Core PT constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

591.   In connection with the claims identified in the within Complaint, Elia and Siddique ("Count IX defendants") intentionally caused to be prepared, faxed, and mailed false medical documentation by Core PT, or knew that such false medical documentation would be faxed and mailed in the ordinary course of Core PT's business, or should have reasonably foreseen that the mailing of such false medical documentation by Core PT would occur, in furtherance of the Count IX defendants' scheme to defraud.

592.   The Count IX defendants knew that two (2) or more faxes and mailings would be sent to demand and receive payment from Allstate on certain dates, including, but not limited to, those mailings identified in the chart annexed hereto at Exhibit 8.

593.   As documented above, the Count IX defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by

Core PT, which they knew would be billed by Core PT, in order to collect payment from Allstate under applicable provisions of the Michigan No-Fault Act.

594.   Elia owned and managed Core PT and was responsible for all actions taken by Core PT and its staff.

595.   Siddique wrote medically unnecessary physical therapy prescriptions and made predetermined referrals that falsely created the appearance of injury and allowed Core PT to bill Allstate.

596.   The Count IX defendants submitted, and caused to be submitted, false and fraudulent medical records, bills, and invoices that created the appearance of injury and permitted Core PT to continue providing unlawful and medically unnecessary treatment, if provided at all.

597.   As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued payment drafts to Core PT for the benefit of the Count IX defendants that would not otherwise have been paid.

598.   The Count IX defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

599.   By virtue of the Count IX defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them,

and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

### COUNT X
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Core PT Enterprise)
### Against Salwa Elia and Naveed Siddique, M.D.

600.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 513 set forth above as if fully set forth herein.

601.   Defendants Elia and Siddique ("Count X defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Core PT.

602.   The Count X defendants each agreed to further, facilitate, support, and operate the Core PT enterprise.

603.   As such, the Count X defendants conspired to violate 18 U.S.C. § 1962(c).

604.   The purpose of the conspiracy was to obtain insurance payments from Allstate on behalf of Core PT even though Core PT was not eligible to collect such payments by virtue of its unlawful conduct.

605.   The Count X defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

606.   Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make insurance payments as a result of the Count X defendants' unlawful conduct described herein.

607.   By virtue of this violation of 18 U.S.C. § 1962(d), the Count X defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count X defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

### COUNT XI
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Mirna PT Enterprise)
### Against Mirna Kakos and Thaer Kakos

608.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 513 set forth above as if fully set forth herein.

609.   Mirna PT constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

610.   In connection with the claims identified in the within Complaint, Mirna Kakos and Thaer Kakos ("Count XI defendants") intentionally caused to be prepared, faxed, and mailed false medical documentation by Mirna PT, or knew that such false medical documentation would be faxed and mailed in the ordinary course of Mirna PT's business, or should have reasonably foreseen that the mailing of such

false medical documentation by Mirna PT would occur, in furtherance of the Count XI defendants' scheme to defraud.

611.   The Count XI defendants knew that two (2) or more faxes and mailings would be sent to demand and receive payment from Allstate on certain dates, including, but not limited to, those mailings identified in the chart annexed hereto at Exhibit 8.

612.   As documented above, the Count XI defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by Mirna PT, which they knew would be billed by Mirna PT, in order to collect payment from Allstate under applicable provisions of the Michigan No-Fault Act.

613.   Mirna Kakos and Thaer Kakos owned and managed Mirna PT and were responsible for all actions taken by Mirna PT and its staff.

614.   The Count XI defendants submitted, and caused to be submitted, false and fraudulent medical records, bills, and invoices that created the appearance of injury and permitted Mirna PT to continue providing unlawful and medically unnecessary treatment, if provided at all.

615.   As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued

payment drafts to Mirna PT for the benefit of the Count XI defendants that would not otherwise have been paid.

616.   The Count XI defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

617.   By virtue of the Count XI defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

<u>**COUNT XII**</u>
**VIOLATION OF 18 U.S.C. § 1962(d)**
**(Mirna PT Enterprise)**
**Against Mirna Kakos and Thaer Kakos**

618.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 513 set forth above as if fully set forth herein.

619.   Defendants Mirna Kakos and Thaer Kakos ("Count XII defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Mirna PT.

620.   The Count XII defendants each agreed to further, facilitate, support, and operate the Mirna PT enterprise.

621.   As such, the Count XII defendants conspired to violate 18 U.S.C. § 1962(c).

622. The purpose of the conspiracy was to obtain insurance payments from Allstate on behalf of Mirna PT even though Mirna PT was not eligible to collect such payments by virtue of its unlawful conduct.

623. The Count XII defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

624. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make insurance payments as a result of the Count XII defendants' unlawful conduct described herein.

625. By virtue of this violation of 18 U.S.C. § 1962(d), the Count XII defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count XII defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT XIII
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Olympic PT Enterprise)
### Against Mirna Kakos, Thaer Kakos, and Naveed Siddique, M.D.

626. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 513 set forth above as if fully set forth herein.

132

627.   Olympic PT constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

628.   In connection with the claims identified in the within Complaint, Mirna Kakos, Thaer Kakos, and Siddique ("Count XIII defendants") intentionally caused to be prepared, faxed, and mailed false medical documentation by Olympic PT, or knew that such false medical documentation would be faxed and mailed in the ordinary course of Olympic PT's business, or should have reasonably foreseen that the mailing of such false medical documentation by Olympic PT would occur, in furtherance of the Count XIII defendants' scheme to defraud.

629.   The Count XIII defendants knew that two (2) or more faxes and mailings would be sent to demand and receive payment from Allstate on certain dates, including, but not limited to, those mailings identified in the chart annexed hereto at Exhibit 8.

630.   As documented above, the Count XIII defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by Olympic PT, which they knew would be billed by Olympic PT, in order to collect payment from Allstate under applicable provisions of the Michigan No-Fault Act.

631.   Mirna Kakos and Thaer Kakos owned and managed Olympic PT and were responsible for all actions taken by Olympic PT and its staff.

632.    Siddique wrote medically unnecessary physical therapy prescriptions and made predetermined referrals that falsely created the appearance of injury and allowed Olympic PT to bill Allstate.

633.    The Count XIII defendants submitted, and caused to be submitted, false and fraudulent medical records, bills, and invoices that created the appearance of injury and permitted Olympic PT to continue providing unlawful and medically unnecessary treatment, if provided at all.

634.    As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued payment drafts to Olympic PT for the benefit of the Count XIII defendants that would not otherwise have been paid.

635.    The Count XIII defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

636.    By virtue of the Count XIII defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT XIV
## VIOLATION OF 18 U.S.C. § 1962(d)
### (Olympic PT Enterprise)
### Against Mirna Kakos, Thaer Kakos, and Naveed Siddique, M.D.

637.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 513 set forth above as if fully set forth herein.

638.   Defendants Mirna Kakos, Thaer Kakos, and Siddique ("Count XIV defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Olympic PT.

639.   The Count XIV defendants each agreed to further, facilitate, support, and operate the Olympic PT enterprise.

640.   As such, the Count XIV defendants conspired to violate 18 U.S.C. § 1962(c).

641.   The purpose of the conspiracy was to obtain insurance payments from Allstate on behalf of Olympic PT even though Olympic PT was not eligible to collect such payments by virtue of its unlawful conduct.

642.   The Count XIV defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

643.   Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make insurance

payments as a result of the Count XIV defendants' unlawful conduct described herein.

644.   By virtue of this violation of 18 U.S.C. § 1962(d), the Count XIV defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count XIV defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT XV
## COMMON LAW FRAUD
### Against All Defendants

645.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 513 set forth above as if fully set forth herein.

646.   The scheme to defraud perpetrated by Healing Service PT, Happy Life, New Age PT, Faith PT, Core PT, Mirna PT, Olympic PT, Mirna Kakos, Thaer Kakos, Al Soudani, Elia, Fakhouri, Hemana, Sesi, Karrumi, and Siddique ("Count XV defendants") was dependent upon a succession of material misrepresentations of fact that the defendants were entitled to collect benefits pursuant to applicable provisions of the Michigan No-Fault Act.

647.   The misrepresentations of fact made by the Count XV defendants include, but are not limited to, those material misrepresentations discussed in section XI, *supra*.

648. The Count XV defendants' representations were false or required disclosure of additional facts to render the information furnished not misleading.

649. The misrepresentations were intentionally made by the Count XV defendants in furtherance of their scheme to defraud Allstate by submitting, causing to be submitted, or knowing that non-compensable claims for payment pursuant to applicable provisions of the Michigan No-Fault Act would be submitted to Allstate.

650. The Count XV defendants' misrepresentations were known to be false and were made for the purpose of inducing Allstate to make payments for claims that are not compensable under Michigan law.

651. Allstate reasonably relied upon such material misrepresentations to its detriment in paying numerous non-meritorious bills for alleged medical expenses pursuant to insurance claims and in incurring expenses related to the adjustment and processing of claims submitted by the defendants.

652. As a direct and proximate result of the defendants' fraudulent representations and acts, Allstate has been damaged in its business and property as previously described herein.

## COUNT XVI
## CIVIL CONSPIRACY
## Against All Defendants

653. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 513 set forth above as if fully set forth herein.

654. Defendants Healing Service PT, Happy Life, New Age PT, Faith PT, Core PT, Mirna PT, Olympic PT, Mirna Kakos, Thaer Kakos, Al Soudani, Elia, Fakhouri, Hemana, Sesi, Karrumi, and Siddique ("Count XVI defendants") combined and concerted to accomplish the unlawful purpose of defrauding Allstate by submitting claims for payment pursuant to applicable provisions of the Michigan No-Fault Act to which they were not entitled because (1) the defendants did not actually render the treatment for which claims were submitted, (2) the defendants did not provide reasonably necessary medical treatment, (3) the defendants did not lawfully render treatment, and (4) the defendants engaged in fraudulent billing practices.

655. The Count XVI defendants worked together to achieve an unlawful purpose (namely, defrauding Allstate for personal gain).

656. This purpose was known to all of the Count XVI defendants and intentionally pursued.

657. Despite knowing that the defendants were not entitled to payment pursuant to applicable provisions of the Michigan No-Fault Act because they billed for services that were not actually provided, because they billed for services that were not reasonably necessary, because treatment was not lawfully rendered, and because they engaged in fraudulent billing practices, the Count XVI defendants nonetheless submitted, caused to be submitted, or knew that claims would be

submitted (with accompanying false medical documentation) to Allstate seeking payment.

658.   In reasonable reliance on the false medical documentation submitted by the defendants, Allstate paid certain of the claims submitted.

659.   All of the Count XVI defendants directly benefited from the payments made to Healing Service PT, Happy Life, New Age PT, Faith PT, Core PT, Mirna PT, and Olympic PT.

660.   All of the Count XVI defendants actively and intentionally partook in a scheme to defraud Allstate and also encouraged and aided other Count XVI defendants in the commission of acts done for the benefit of all Count XVI defendants and to the unjustified detriment of Allstate.

661.   Accordingly, all of the Count XVI defendants are equally liable for the fraud perpetrated on Allstate pursuant to their conspiracy.

<u>**COUNT XVII**</u>
**PAYMENT UNDER MISTAKE OF FACT**
**Against Healing Service Physical Therapy Inc, Happy Life Two Inc, New Age PT Rehab Inc, Faith Physical Therapy LLC, Core Physical Therapy Corp, Mirna Physical Therapy LLC, and Olympic Physical Therapy Plus LLC**

662.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 513 set forth above as if fully set forth herein.

663.   Allstate paid the amounts described herein and itemized in Exhibits 9 through 15 under a misunderstanding, misapprehension, error, fault, or ignorance of

material facts, namely, the scheme to defraud Allstate by misrepresenting the fact, lawfulness, and necessity of services and billed by Healing Service PT, Happy Life, New Age PT, Faith PT, Core PT, Mirna PT, and Olympic PT ("Count XVII defendants").

664.    Allstate sustained damages by paying under a mistake of fact the claims submitted by the Count XVII defendants, which misrepresented the fact, reasonableness, necessity, and lawfulness of the medical services allegedly rendered and whether the patient's injury arose out of a motor vehicle accident.

665.    The Count XVII defendants, individually and jointly, would be unjustly enriched if permitted to retain the payments made to them by Allstate under a mistake of fact.

666.    Allstate is entitled to restitution from each of the Count XVII defendants, individually and jointly, for all monies paid to and/or received by them from Allstate.

## COUNT XVIII
## UNJUST ENRICHMENT
### Against All Defendants

667.    Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 513 set forth above as if fully set forth herein.

668.    Defendants Healing Service PT, Happy Life, New Age PT, Faith PT, Core PT, Mirna PT, Olympic PT, Mirna Kakos, Thaer Kakos, Al Soudani, Elia,

Fakhouri, Hemana, Sesi, Karrumi, and Siddique ("Count XVIII defendants") submitted, caused to be submitted, or benefited from claims submitted to Allstate that caused Allstate to pay money, in reasonable belief that it was legally obligated to make such payments based upon the defendants' fraudulent misrepresentations.

669.   Allstate's payments constitute a benefit that the Count XVIII defendants aggressively sought and voluntarily accepted.

670.   The Count XVIII defendants wrongfully obtained or benefited from payments from Allstate through the fraudulent scheme detailed herein.

671.   The Count XVIII defendants have been unjustly enriched by receipt of and benefit from these wrongfully obtained payments from Allstate.

672.   The Count XVIII defendants' retention of these payments would violate fundamental principles of justice, equity, and good conscience.

## COUNT XIX
## DECLARATORY RELIEF PURSUANT TO 28 U.S.C. § 2201
### Against All Defendants

673.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 513 set forth above as if fully set forth herein.

674.   Defendants Healing Service PT, Happy Life, New Age PT, Faith PT, Core PT, Mirna PT, Olympic PT, Mirna Kakos, Thaer Kakos, Al Soudani, Elia, Fakhouri, Hemana, Sesi, Karrumi, and Siddique ("Count XIX defendants") routinely

billed or caused bills to be submitted for unnecessary and unlawful services with respect to the patients at issue in this Complaint.

675.   The Count XIX defendants also billed for services not rendered.

676.   The Count XIX defendants also billed for services pursuant to a fraudulent scheme whereby patients were illegally solicited and referred to them for the purpose of generating claims to Allstate, and not for the purpose of providing reasonably necessary medical treatment, testing, or services.

677.   Pursuant to the Michigan No-Fault Act, an insurer is liable to pay benefits only for reasonable and necessary expenses for lawfully rendered treatment arising out of a motor vehicle accident.  Mich. Comp. Laws §§ 500.3105, 500.3107, and 500.3157(1).

678.   The lack of reasonableness and necessity are defenses to an insurer's obligation to pay No-Fault benefits arising out of a motor vehicle accident.  Mich. Comp. Laws § 500.3107.

679.   The lack of lawfully-rendered treatment (such as treatment arising from illegal solicitation and unlicensed treatment) is also a defense to an insurer's obligation to pay No-Fault benefits.

680.   Where a provider is unable to show that an expense has been incurred for a reasonably necessary product or service arising out of a motor vehicle accident,

there can be no finding of a breach of the insurer's duty to pay, and thus no finding of liability with regard to that expense.

681. The Count XIX defendants continue to submit claims under applicable provisions of the Michigan No-Fault Act for unnecessary and unlawfully rendered medical services to Allstate, and other claims remain pending with Allstate.

682. The Count XIX defendants will continue to submit claims under applicable provisions of the Michigan No-Fault Act absent a declaration by this Court that Allstate has no obligation to pay pending and previously-denied insurance claims submitted by any of the Count XIX defendants for any or all of the reasons set out in the within Complaint.

683. Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XIX defendants billed for unnecessary and unlawful treatment that is not compensable under applicable provisions of the Michigan No-Fault Act.

684. Allstate also requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XIX defendants were engaged in a fraudulent scheme whereby they billed for unnecessary and unlawful treatment and submitted unreasonable charges for the same to Allstate at all relevant times.

685. As such, the Count XIX defendants have no standing to submit, pursue, or receive benefits or any other payment from Allstate, and Allstate requests a

judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XIX defendants cannot seek payment from Allstate for benefits under Michigan's No-Fault Act, Mich. Comp. Laws § 500.3101, *et seq*., any policy of insurance, any assignment of benefits, any lien of any nature, or any other claim for payment related to the conduct detailed in the within Complaint.

686.   Allstate further requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XIX defendants cannot balance bill or otherwise seek payment from any person insured under an Allstate policy or for whom Allstate is the responsible payor related to the conduct detailed in the within Complaint.

## XV.   DEMAND FOR RELIEF

WHEREFORE, plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company respectfully pray that judgment enter in their favor as follows:

**COUNT I**
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(Healing Service PT Enterprise)**
**Against Nick Hemana and Naveed Siddique, M.D.**

(a)      AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

### COUNT II
**VIOLATION OF 18 U.S.C. § 1962(d)**
**(Healing Service PT Enterprise)**
**Against Nick Hemana and Naveed Siddique, M.D.**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

### COUNT III
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(Happy Life Enterprise)**
**Against Nicholas Sesi and Natham Karrumi, D.C.**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)      AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964,

together with interest, costs, and attorney's fees;

(c)      GRANT Allstate injunctive relief enjoining the defendants from

engaging in the wrongful conduct alleged in the within Complaint; and

(d)      GRANT all other relief this Court deems just.

### COUNT IV
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Happy Life Enterprise)
### Against Nicholas Sesi and Natham Karrumi, D.C.

(a)      AWARD Allstate its actual and consequential damages in an amount

to be determined at trial;

(b)      AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964,

together with interest, costs, and attorney's fees;

(c)      GRANT Allstate injunctive relief enjoining the defendants from

engaging in the wrongful conduct alleged in the within Complaint; and

(d)      GRANT all other relief this Court deems just.

### COUNT V
### VIOLATION OF 18 U.S.C. § 1962(c)
### (New Age PT Enterprise)
### Against Lamya Fakhouri and Naveed Siddique, M.D.

(a)      AWARD Allstate its actual and consequential damages in an amount

to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964,

together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from

engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT VI
### VIOLATION OF 18 U.S.C. § 1962(d)
### (New Age PT Enterprise)
### Against Lamya Fakhouri and Naveed Siddique, M.D.

(a)     AWARD Allstate its actual and consequential damages in an amount

to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964,

together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from

engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT VII
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Faith PT Enterprise)
### Against Louay Al Soudani and Mirna Kakos

(a)     AWARD Allstate its actual and consequential damages in an amount

to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

**COUNT VIII**
**VIOLATION OF 18 U.S.C. § 1962(d)**
**(Faith PT Enterprise)**
**Against Louay Al Soudani and Mirna Kakos**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

**COUNT IX**
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(Core PT Enterprise)**
**Against Salwa Elia and Naveed Siddique, M.D.**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT X
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Core PT Enterprise)
### Against Salwa Elia and Naveed Siddique, M.D.

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT XI
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Mirna PT Enterprise)
### Against Mirna Kakos and Thaer Kakos

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)      AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964,

together with interest, costs, and attorney's fees;

(c)      GRANT Allstate injunctive relief enjoining the defendants from

engaging in the wrongful conduct alleged in the within Complaint; and

(d)      GRANT all other relief this Court deems just.

## COUNT XII
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Mirna PT Enterprise)
### Against Mirna Kakos and Thaer Kakos

(a)      AWARD Allstate its actual and consequential damages in an amount

to be determined at trial;

(b)      AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964,

together with interest, costs, and attorney's fees;

(c)      GRANT Allstate injunctive relief enjoining the defendants from

engaging in the wrongful conduct alleged in the within Complaint; and

(d)      GRANT all other relief this Court deems just.

## COUNT XIII
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Olympic PT Enterprise)
### Against Mirna Kakos, Thaer Kakos, and Naveed Siddique, M.D.

(a)      AWARD Allstate its actual and consequential damages in an amount

to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

### COUNT XIV
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Olympic PT Enterprise)
### Against Mirna Kakos, Thaer Kakos, and Naveed Siddique, M.D.

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

### COUNT XV
### COMMON LAW FRAUD
### Against All Defendants

(a)     AWARD Allstate its actual and consequential damages against the defendants jointly and severally in an amount to be determined at trial;

(b)     AWARD Allstate its costs, including, but not limited to, investigative costs incurred in the detection of the defendants' illegal conduct; and

151

(c)     GRANT all other relief this Court deems just.

## COUNT XVI
## CIVIL CONSPIRACY
### Against All Defendants

(a)     AWARD Allstate its actual and consequential damages against the

defendants jointly and severally in an amount to be determined at trial;

(b)     AWARD Allstate its costs, including, but not limited to, investigative

costs incurred in the detection of the defendants' illegal conduct; and

(c)     GRANT all other relief this Court deems just.

## COUNT XVII
## PAYMENT UNDER MISTAKE OF FACT
### Against Healing Service Physical Therapy Inc, Happy Life Two Inc, New Age PT Rehab Inc, Faith Physical Therapy LLC, Core Physical Therapy Corp, Mirna Physical Therapy LLC, and Olympic Physical Therapy Plus LLC

(a)     AWARD Allstate its actual and consequential damages in an amount

to be determined at trial; and

(b)     GRANT all other relief this Court deems just.

## COUNT XVIII
## UNJUST ENRICHMENT
### Against All Defendants

(a)     AWARD Allstate its actual and consequential damages in an amount

to be determined at trial; and

(b)     GRANT all other relief this Court deems just.

## COUNT XIX
## DECLARATORY RELIEF PURSUANT TO 28 U.S.C. § 2201
### Against All Defendants

(a)     DECLARE that Allstate has no obligation to pay pending and previously-denied insurance claims submitted by Healing Service Physical Therapy Inc, Happy Life Two Inc, New Age PT Rehab Inc, Faith Physical Therapy LLC, Core Physical Therapy Corp, Mirna Physical Therapy LLC, Olympic Physical Therapy Plus LLC, Mirna Kakos, Thaer Kakos, Louay Al Soudani, Salwa Elia, Lamya Fakhouri, Nick Hemana, Nicholas Sesi, Natham Karrumi, D.C., and Naveed Siddique, M.D. for any or all of the reasons set out in the within Complaint;

(b)     DECLARE that Healing Service Physical Therapy Inc, Happy Life Two Inc, New Age PT Rehab Inc, Faith Physical Therapy LLC, Core Physical Therapy Corp, Mirna Physical Therapy LLC, Olympic Physical Therapy Plus LLC, Mirna Kakos, Thaer Kakos, Louay Al Soudani, Salwa Elia, Lamya Fakhouri, Nick Hemana, Nicholas Sesi, Natham Karrumi, D.C., and Naveed Siddique, M.D., jointly and severally, cannot seek payment from Allstate pursuant to the Michigan No-Fault Act, Mich. Comp. Laws § 500.3101, *et seq.*, any policy of insurance, any assignment of benefits, any lien of any nature, or any other claim for payment related to the conduct detailed in the within Complaint;

(c)     DECLARE that Healing Service Physical Therapy Inc, Happy Life Two Inc, New Age PT Rehab Inc, Faith Physical Therapy LLC, Core Physical

Therapy Corp, Mirna Physical Therapy LLC, Olympic Physical Therapy Plus LLC, Mirna Kakos, Thaer Kakos, Louay Al Soudani, Salwa Elia, Lamya Fakhouri, Nick Hemana, Nicholas Sesi, Natham Karrumi, D.C., and Naveed Siddique, M.D., jointly and severally, cannot balance bill or otherwise seek payment from any person insured under an Allstate policy or for whom Allstate is the responsible payor related to the conduct detailed in the within Complaint; and

(d)     GRANT such other relief as this Court deems just and appropriate under Michigan law and the principles of equity.

## XVI. <u>DEMAND FOR JURY TRIAL</u>

The plaintiffs hereby demand a trial by jury on all claims.

[SIGNATURE PAGE FOLLOWS]

154

Respectfully submitted,

SMITH & BRINK

*/s/ Jacquelyn A. McEttrick*
_____
Nathan A. Tilden (P76969)
ntilden@smithbrink.com
Jacquelyn A. McEttrick
jmcettrick@smithbrink.com
Andrew H. DeNinno
adeninno@smithbrink.com
38777 Six Mile Road, Suite 314
Livonia, MI 48152
(734) 521-9000

350 Granite Street, Suite 2204
Braintree, MA 02184
(617) 770-2214

*Attorneys for Plaintiffs*
*Allstate Insurance Company,*
*Allstate Fire and Casualty Insurance*
*Company, and Allstate Property and*
*Casualty Insurance Company,*

Dated: October 27, 2021